# EXHIBIT L

**[2011 (2) CILR 148]**

**RENOVA RESOURCES PRIVATE EQUITY LIMITED**

*v.*

**GILBERTSON and FOUR OTHERS**

**GILBERTSON and AUTUMN HOLDINGS ASSET INCORPORATED**

*v.*

**VEKSELBERG, KUZNETSOV, RENOVA HOLDING LIMITED and
RENOVA RESOURCES PRIVATE EQUITY LIMITED**

*Grand Court, Financial Services Division*

(Foster, J.)

**5 August 2011**

*Civil Procedure—discovery—failure to comply with order—court may, by Grand Court Rules 1995, O.24, r.20, strike out statement of case for failure to comply with discovery order—"discovery orders" include orders for preservation of documents, as ancillary to discovery process and related to common law discovery obligations—statement of case struck out only if substantial risk of unfairness at trial, not merely to punish blameworthy party*

*Civil Procedure—discovery—obligations after commencement of action—discovery obligations arise after commencement of action, whether or not discovery order made, not to dispose of potentially relevant information—statement of case may be struck out under inherent jurisdiction when potentially relevant information disposed of, creating substantial risk of unfairness at trial*

The plaintiff (R) commenced a multiple derivative action in respect of alleged breaches of fiduciary duty and knowing receipt of property.

R formed part of a Russian private conglomerate, with considerable investments in natural resources. The first defendant (G), a businessman in the mining industry, agreed to create a Cayman investment structure with R's holding company that was intended to facilitate a joint venture for the exploration, acquisition, and development of opportunities in the metal and mining industry. Investments were to be held by a master fund. G proposed that the master fund acquire rights to the Fabergé brand, through the investment structure, and for this purpose formulated "Project Egg." A dispute arose between R and G and his associates when G acquired the Fabergé rights outside the investment structure, having raised the necessary funds from (*inter alia*) one of his associates. R issued a writ and statement of claim against G and his associates claiming breach of the joint venture agreement in May 2008, and they in turn issued a defence and counterclaim alleging breach of the agreement by R.

After a contested hearing, the Grand Court (Foster, Ag. J.) gave leave to R to continue the action pursuant to the Grand Court Rules, O.15, r.12A(2) (in proceedings reported at *2009 CILR 268*). At a further contested hearing, the Grand Court (Foster, Ag. J.) dismissed R's application for summary judgment against G's counterclaim (in proceedings reported at *2010 (1) CILR 344*).

After contemporaneous interlocutory hearings, a consent order had been made in respect of discovery on July 20th, 2010. A dispute subsequently arose over the failure by R to preserve internal communications, including copies and back-ups of e-mails. R had previously been advised by its attorneys as early as January 2007, prior to the commencement of proceedings, of the need to preserve all relevant information. Shortly before commencement, its server in Zurich had crashed, but its I.T. staff were not made aware of the legal proceedings, or the need to preserve information, until December 2010. During the interim period, they deleted the Zurich server database, a copy of it that had been moved to a Moscow server, and its back-up tapes. After a contested hearing, a further order was made on November 30th, 2010 for the preservation of potentially relevant sources of electronic information, and for the service of further and better lists by R. In December 2010, R's I.T. staff deleted the logical drive of the Zurich server. R and its associates served further and better lists, verified by affidavit.

G applied for R's statements of case to be struck out, submitting that (a) R had seriously disregarded its discovery obligations, which existed in the absence of an order for discovery; (b) R's culpable destruction of relevant information was sufficiently prejudicial to cause a substantial risk of unfairness at the trial; (c) the court was empowered to strike out a statement of case by GCR, O.24, r.20, or under its inherent jurisdiction, whenever an order for the preservation of relevant documents, which was ancillary to the discovery process, was made and breached; and (d) the

court was entitled to take into account all further affidavits and evidence filed in the application.

R submitted in reply that (a) it was not at fault, had acted reasonably, and had no obligation to preserve documents in the absence of an order for discovery; (b) the information destroyed was neither sufficiently fundamental nor prejudicial to warrant striking out the proceedings; (c) the court could not strike out a statement of case by GCR, O.24, r.20, the only basis for a strike-out, in the absence of a breach of an order for discovery, and a preservation order was not an order for discovery for those purposes; and (d) the court should not go behind R's discovery affidavits by considering further materials.

**Held,** dismissing the application:

(1) The obligation to preserve relevant sources of information arose in the absence of an order for discovery, and applied to parties before and after proceedings commenced. Prior to the commencement of proceedings, the court would strike out a party's statement of case if it had destroyed sources of relevant information in such a way as to appear to be intended to pervert the course of justice. In cases, as here, in which legal proceedings had commenced before the disposal of relevant information, the court would order a strike-out only if the prejudice of doing so was outweighed by a substantial risk of unfairness at trial (paras. 60–62).

(2) R's destruction of relevant sources of information did not sufficiently prejudice G to justify striking out the claim. The court would not strike out a statement of case merely to punish a blameworthy party, but only if its conduct rendered a fair trial impossible, or created a substantial risk of doing so. The court would act proportionately to the seriousness of the offending party's default and its consequences. The internal communications destroyed in the present case were not fundamental to the resolution of the issues in dispute, notwithstanding that they may have proved useful to G in cross-examination. The application for strike-out would be dismissed (paras. 68–72).

(3) The court was empowered to strike out a statement of case either by GCR, O.24, r.20, or under its inherent jurisdiction to ensure fairness between the parties, even in the absence of a discovery order. Although the wording of GCR, O.24, r.20 was narrower than RSC, O.24, r.16, the reference to non-compliance with an order for discover was apt to encompass orders for the preservation of documents, as in the present case. Such orders were clearly ancillary to the discovery process and related to the parties' discovery obligations (paras. 63–65).

(4) Moreover, although the court would not usually go behind discovery affidavits, it would have regard to all further affidavits and expert evidence filed by parties to a strike-out application. It was also possible, in principle, to order cross-examination, if required (paras. 66–67).

**Cases cited:**

(1) *Arrow Nominees Inc. v. Blackledge*, [2000] 2 BCLC 167; [2001] BCC 591; [2000] C.P. Rep. 59, followed.

(2) *British American Tobacco Australia Servs. Ltd. v. Cowell*, [2002] V.S.C.A. 197, followed.

(3) *Brown v. Horvat Properties (Cayman Islands) Ltd.*, 1992–93 CILR N–5, followed.

(4) *Compagnie Fin. et Comm. du Pacifique v. Peruvian Guano Co.* (1882), 11 Q.B.D. 55; 52 L.J.Q.B. 181, followed.

(5) *Douglas v. Hello! Ltd.*, [2003] 1 All E.R. 1087 (Note); [2003] E.M.L.R. 29; [2003] EWHC 55 (Ch), followed.

(6) *HSH Cayman I GP Ltd. v. ABN AMRO Bank N.V.*, 2010 (1) CILR 114, referred to.

(7) *Landauer Ltd. v. Comins & Co.*, [1991] T.L.R. 382; *The Times*, August 7th, 1991, followed.

(8) *Logicrose Ltd. v. Southend Utd. F.C. Ltd.* (1988), 132 Sol. Jo. 1591; *The Times*, March 5th, 1988, followed.

(9) *Lonrho Plc v. Fayed (No. 3)*, [1993] T.L.R. 347, distinguished.

(10) *TMSF v. Wisteria Bay Ltd.*, 2008 CILR 231, distinguished.

**Legislation construed:**

Grand Court Rules 1995, O.24, r.20: The relevant terms of this rule are set out at para. 39.

*A. Choo-Choy*, *Q.C.*, *G. Halkerston* and *D. Butler* for the applicants;

*R. Millett*, *Q.C.*, *J. Eldridge* and *M. Kish* for the respondents.

1. **FOSTER, J.:** This is an application by the first and fifth defendants/plaintiffs to the counterclaim (to whom I shall refer together as appropriate as either "the applicants" or "the Gilbertson parties"), by a summons dated April 27th, 2011, for orders that the plaintiff's writ and statement of claim and the defences to the counterclaim be struck out pursuant to the Grand Court Rules 1995, O.24, r.20 and/or the inherent jurisdiction of the court. I shall refer to the plaintiff/defendants to the counterclaim together as appropriate as either "the respondents" or "the Renova parties." The applicants' summons also seeks the costs of the action and the counterclaim against the respondents on the indemnity basis and such other relief as the court may think fit in respect of the applicants' application, which is based on alleged failures by the respondents to comply with their discovery obligations.

2. During the course of these proceedings the court has made several orders in relation to discovery as follows:

(a) On July 20th, 2010 the court gave directions ("the July 20th order") *inter alia* as follows:

"(i) the parties shall exchange lists of documents no later than 12.00 p.m. on September 17th, 2010; and

(ii) there shall be inspection of documents (some of which may be subject to a confidentiality regime) no later than 4.00 p.m. on September 24th, 2010."

(b) On November 30th, 2010 the court ordered ("the November 30th order") as follows:

"(i) each of the plaintiff/defendants to the counterclaim shall prepare and serve a further and better list of documents by 4.00 p.m. on January 18th, 2011, such list to identify all relevant documents (and for the avoidance of doubt such documents must include *inter alia* (whether in hard copy or electronic form on any computer, server, laptop or handheld device of any kind wherever they may be) memos, notes of meetings and discussions, including telephone conversations and e-mails or other data sent to or from any e-mail address used by any of the plaintiff/defendants to counterclaim or, in the case of a corporate party, by any of the beneficial owners, directors, officers or employees or anyone else on its behalf, which relate in any way to the matters in question in this action and including the letter agreement, the Pallinghurst structure, Project Egg or the acquisition of the Fabergé rights) which are or have been in the possession, custody or power of that plaintiff/defendants to the counterclaim;

(ii) each further and better list shall be verified by affidavit, in the case of individual parties by that individual personally and in respect of corporate parties by a director of the company who shall be attending to give evidence at the trial of the cause;

(iii) the plaintiff/defendants to the counterclaim must each forthwith take all steps necessary to preserve all computers, servers, back-up tapes, handheld electronic devices or other means of transmitting or receiving data and all or any data in their possession, custody or power which they are advised by Maples and Calder may be relevant which is held or stored on or by any such or similar means in any jurisdiction whatsoever until the conclusion of the claim or further order. For this purpose, the individual defendants to the counterclaim (Viktor Vekselberg and Vladimir Viktorovich Kuzhnetsov) must ensure compliance with this order personally and through any others (including any other members of the Renova Group) acting on their behalf; and the corporate plaintiff and defendants to the counterclaim (Renova Holding Ltd. and Renova Resources Private Equity Ltd.) must comply with this order by their respective beneficial owners, officers, employees, agents and anyone on their behalf, including other members of the Renova Group;

(iv) the partner in Maples and Calder with conduct of this case on behalf of the plaintiff/defendants to the counterclaim shall serve at

the time of service of each of the further and better lists of documents mentioned at para. (i) above, an affidavit explaining the precise steps taken by each of the plaintiff/defendants to the counterclaim in compliance with this order and when, where and how such steps were taken;

(v) the plaintiff/defendants to the counterclaim must each provide a detailed log (with technical assistance if necessary, such assistance to be specifically identified) of all computers, servers, back-up tapes, handheld electronic devices or other means of transmitting or receiving data referred to at para. (iii) above, identifying precisely the nature, medium (whether encrypted or unencrypted) and the exact location and custodian of the same and the data which is or was thereon which they have been advised by Maples and Calder may be relevant and such log must be exhibited in each case to the affidavit sworn in verification of each of the further and better lists of the plaintiff/defendants to the counterclaim as mentioned at para. (ii) above;

(vi) there be a case management conference in mid-February 2011 to be fixed by the parties no later than December 17th, 2010;

(vii) liberty to apply for further or other directions on proper notice to every other party;

(viii) the costs of and occasioned by the summons of the first and fifth defendants/plaintiffs to the counterclaim dated November 5th, 2010 be paid by the plaintiff/defendants to the counterclaim, such costs to be taxed if not agreed."

That order included a penal notice.

(c) On April 7th, 2011 the court ordered ("the April 7th order") that the individual Renova parties, Mr. Viktor Vekselberg and Mr. Vladimir Kuznetsov, should comply with the precise terms of the November 30th order (*i.e.* to verify by affidavit sworn personally their respective further and better lists of documents no later than April 21st, 2011).

3. The applicants contend that the Renova parties have failed to comply with their discovery obligations generally, including the terms of the November 30th order, and that as a result there is a substantial risk that a fair trial of the original action and of the counterclaim is not possible. They submit that, accordingly, the original action and the defences to the counterclaim should be struck out pursuant to GCR, O.24, r.20 and/or pursuant to the inherent jurisdiction of the court.

**Background**

4. The background to the Renova parties' claims against the Gilbertson parties was set out in some detail in my initial ruling dated April 14th, 2009 and summarized again, more briefly, in my third ruling dated May 5th, 2010. Although I do not consider it necessary for present purposes to reiterate all of the details as set out in those rulings, nonetheless in order to address the questions concerning discovery which are the subject of this application I should, at the risk of repeating what I have already said before in these proceedings, explain at least the general background and the principal issues in the case. The original action is a derivative action, indeed a "multiple derivative action," brought by Renova Resources Private Equity Ltd. ("the plaintiff"), one of the corporate Renova parties.

5. The plaintiff is a member of the Renova Group of companies, which is ultimately controlled by one of the individual Renova parties, Mr. Vekselberg. The Renova Group is one of Russia's leading private conglomerates. It comprises a considerable number of companies with significant investments in various sectors, including, *inter alia*, oil, metals, mining and construction in various countries. Although Mr. Vekselberg and others are based in Moscow, the group has significant offices in Zurich, Switzerland. The Investment Director of the management company of the Renova Group is one of the individual Renova parties, Mr. Kuznetsov, who is based in Zurich. The Chief Legal Officer of the Renova group management company is Mr. Igor Cheremikin, who is based in Moscow, and the Deputy Chief Legal Officer is Mr. David Kalberer, a Swiss lawyer, who is also based in Zurich. I should also mention for convenience at this point, Mr. Sergey Grosset who is the head of the I.T. department of the Renova Group management company, based in Moscow. I shall, in the course of this ruling, refer to other individuals employed by or connected with the Renova Group but these are the principal individuals for these purposes.

6. The plaintiff's claims in the original action are directed at the Gilbertson parties, namely Mr. Brian Gilbertson and a British Virgin Islands company, Autumn Holdings Asset Inc. ("Autumn") which is ultimately a Gilbertson family entity. The Cayman company, Pallinghurst (Cayman) General Partner L.P. (GP) ("the company"), on whose behalf the original action purports to be brought by the plaintiff, is owned as to 50% indirectly by the plaintiff and as to 50% indirectly by Mr. Gilbertson. The two directors of the company are Mr. Gilbertson and Mr. Kuznetsov. The company is the general partner of a Cayman exempted limited partnership which is in turn the general partner of a Cayman investment fund, known as "the master fund." This structure is known as the Pallinghurst structure.

7. The Pallinghurst structure was established to reflect what was essentially a joint venture between Mr. Vekselberg and Mr. Gilbertson as set out

in an agreement between another Renova Group company, the parent of the plaintiff, and Mr. Gilbertson, comprised in a letter dated November 24th, 2005, known as "the letter agreement." For some time prior to and after that date, Mr. Gilbertson was himself employed by a Renova Group company in Russia, although he subsequently ceased to be and is no longer so employed. The expressed purpose of the Pallinghurst structure was to explore, acquire and develop opportunities in the metal and mining industry to be held as investments by the master fund.

8. In summary, the essence of the plaintiff's claim in the original action is that Mr. Gilbertson acted in breach of his fiduciary duties as a director of the company, by diverting away from the company a very valuable opportunity to acquire from Unilever Plc the right to commercially exploit the well-known Fabergé brand ("the rights"). This opportunity to acquire and exploit the rights became known as "Project Egg." There are also claims against the corporate Gilbertson party, Autumn, of knowing participation in this wrongful diversion of assets by Mr. Gilbertson.

9. The acquisition of the rights from Unilever was originally proposed by Mr. Gilbertson as an interesting investment and, although it was not an investment of the kind contemplated for the Pallinghurst structure, and was never approved as such by its investment committee, at least until near to the time of the actual purchase of the rights, the affidavit evidence filed to date by the Gilbertson parties is that the parties were proceeding on the basis that the rights would be acquired by the master fund, which was, of course, an integral part of the Pallinghurst structure, and ultimately therefore to the benefit of the company. The plaintiff's case is that Mr. Gilbertson wrongfully diverted the rights away from the company for his own benefit and not that of the company, by procuring the purchase of the rights with the financial assistance of other investors, rather than Mr. Vekselberg and the Renova Group, and by procuring the issue of shares in a subsidiary of the master fund called Project Egg Ltd. (which was the vehicle used to acquire the rights) to those other investors, thereby diluting the intended interest of the company in the rights through the master fund from 100% to less than 1%. The plaintiff contends that it had been agreed from the start that the Renova Group (subsequently agreed to be through a Group company, Renova Holdings) would provide or procure the funding for the acquisition of the rights on terms which were reasonable and in the best interests of the company, even if, in the event, not ultimately acceptable to Mr. Gilbertson personally. One of the three replacement shareholder investors procured by Mr. Gilbertson was Autumn. The plaintiff contends that Mr. Gilbertson is liable to account to the company and/or the master fund for profits received by him and/or by Autumn, those profits reflecting the very substantial increase in the value of the rights. It pleads also that Autumn is liable for knowing receipt.

10. By their defence and counterclaim the Gilbertson parties contend that Mr. Gilbertson was free to acquire the rights for his own benefit because, he contends, the Renova parties were themselves in breach of the joint venture agreement by insisting at the last minute, as a pre-condition of providing the financing for their purchase of the rights, that the rights should be held by another Renova Group company outside the Pallinghurst structure, "Lamesa." Mr. Gilbertson contends that Mr. Vekselberg's last minute insistence that the rights should be owned by a company outside the Pallinghurst structure, and that he would not finance the purchase of the rights unless it were, was in breach of what had been agreed and of the terms of the joint venture between him and Mr. Vekselberg, as evidenced by the letter agreement and the parties subsequent dealings on that basis.

11. There then followed, between about December 20th, 2006 and early January 2007, negotiations between the parties concerning a possible "implementation agreement" whereby the legal ownership and the economic benefits of the rights would be split but the negotiations were unsuccessful and Mr. Gilbertson proceeded to acquire the rights with funding from alternative sources (including Autumn) as explained above, thereby excluding any benefit to the company (and hence Mr. Vekselberg and the Renova Group).

12. The Gilbertson parties' counterclaim expressly only arises if the plaintiff is successful in the original action. If the plaintiff is not successful, the counterclaim does not need to be pursued. In brief, the counterclaim is to the effect that if the plaintiff is successful in its claim and Mr. Gilbertson is liable for breach of fiduciary duty in acting as he did, Mr. Gilbertson's conduct in acting as he did, and on this assumption his resulting alleged liability, was wholly a result of the Renova parties' own wrongful conduct in seeking to unilaterally change the terms of the agreement between the parties and the basis upon which the rights were to be acquired. The Gilbertson parties contend that the individual Renova parties, Mr. Vekselberg and Mr. Kuznetsov procured this wrongful conduct by the Renova parties and so are liable to indemnify Mr. Gilbertson for any loss he suffers if the plaintiff's claim is successful.

13. The parties disagree over the extent to which some of this background is relevant to the issues in dispute as pleaded. The Renova parties focus for the most part on the period from about December 15th, 2006 to early January 2007. The Gilbertson parties, however, focus also on the earlier period when the letter agreement was being negotiated, and also on the later period up to the end of May 2007, in particular. Leading counsel for the Gilbertson parties, at para. 25 of his skeleton argument, summarized what they contend are the main issues which will arise for determination by the court at trial, amongst others, as follows:

"25.1 The meaning and effect of various provisions (including, but not limited to, clauses 2.1, 2.4, 2.5 and 8.2) of the letter agreement and the inter-relationship between the scope of Mr. Gilbertson's fiduciary duty to the company (on the one hand) and the letter agreement (on the other hand)—this issue will inevitably require consideration by the court of the full factual background to the conclusion of the letter agreement and the precise nature and intended scope of the joint venture between Mr. Gilbertson and Mr. Vekselberg (and the entities associated with them);

25.2 Whether Project Egg [the name given to the proposed acquisition of the rights] was ever approved by both Mr. Gilbertson and Mr. Kuznetsov (and hence, by Mr. Vekselberg, on whose instructions it is common ground that Mr. Kuznetsov acted) to be an investment project of the Pallinghurst structure;

25.3 Why the Renova parties decided not to finance the purchase of the rights unless ownership of the rights was held by Lamesa [the Renova Group Panamanian Company] outside the Pallinghurst structure;

25.4 Whether the ownership of the rights was ever intended to be held outside the Pallinghurst structure;

25.5 Whether it was unreasonable of Mr. Gilbertson and/or otherwise a breach of his fiduciary duty to the company not to have consented to the terms of the draft implementation agreement as demanded by the Renova parties;

25.6 Whether the Renova parties were entitled to insist on the ownership of the rights being transferred to Lamesa, outside the Pallinghurst structure;

25.7 Whether Mr. Vekselberg and/or Mr. Kuznetsov induced or procured Renova Holding to breach the letter agreement by refusing to provide any funding unless ownership of the rights was held by Lamesa outside the Pallinghurst structure.

25.8 Whether Mr. Vekselberg and Mr. Kuznetsov conspired amongst themselves and/or with Renova Holding and/or the plaintiff to damage and/or to commit unlawful acts against the master fund and/or Mr. Gilbertson;

25.9 Whether Mr. Kuznetsov acted in breach of his fiduciary duties to the company, and, if so, whether he is liable in equity to provide a full indemnity or a contribution to Mr. Gilbertson in the event of the latter being held liable for breach of fiduciary duty to the company as the Renova Group claims."

14. Leading counsel for the Renova parties disputed that all of these issues arise from the pleadings for determination, or at least that they are crucial issues clearly requiring determination by the court at a trial. For example, he argued that the letter agreement, being a written document, speaks for itself and that any documentary material relating to the internal views of the parties concerning its purpose or meaning is not relevant or even admissible. He submitted that several of the issues which leading counsel for the Gilbertson parties had raised in para. 25 of his skeleton argument, as summarized above, and as further expanded in para. 27 of his skeleton argument, were either not pleaded or not matters on which the internal views and any internal communications of the parties were relevant.

**The Renova parties' discovery**

15. The basic complaint made by the Gilbertson parties about the Renova parties' discovery largely concerns the lack of discovery of any relevant internal communications, particularly e-mails, or other electronic data, between the individuals involved within the Renova Group, particularly Mr. Vekselberg, Mr. Kuznetsov and Mr. Kalberer, but also of any notes of telephone conversations, meetings and other discussion papers, memoranda or other relevant internal documentation. The Gilbertson parties contrast the significant number of internal e-mails, in particular exchanged as between themselves and also between them and those associated with them, with the handful of internal e-mails discovered by the Renova parties, most, if not all, of which are anyway simply internally forwarding e-mails which had been sent or received externally.

16. The undisputed evidence is that in January 2007 the Renova parties sought advice concerning the prospects of the claim which they now make against the Gilbertson parties in the original action from their London solicitors, Jones Day. In that connection, Mr. Cheremikin and Mr. Kalberer themselves identified and produced to Jones Day what they considered to be the most significant documents to enable Jones Day to advise them on the Renova Group's prospects. Their evidence is, and this was not disputed, that in no sense was this intended to be a full scale discovery exercise on behalf of the Renova Group, but simply identification and production of what Mr. Cheremikin and Mr. Kalberer believed to be the most important documents. The instructions given to, and the advice received from, Jones Day are privileged. However, it was at or about this time that Jones Day instructed Maples and Calder to act as the Renova Group's attorneys in the Cayman Islands. Although the advice given is again privileged, the evidence is that at or about this time Maples and Calder and/or Jones Day advised the Renova Group of the need to preserve all documents which might be relevant to the issues in the proposed proceedings.

17. These proceedings (the original action) were commenced by the plaintiff against, *inter alia*, the Gilbertson parties, on May 20th, 2008. After various interlocutory hearings (including those resulting in the rulings dated April 14th, 2009, April 28th and May 5th, 2010) and the filing by the Gilbertson parties of their defence and counterclaim, the court made, by consent, the July 20th order, which was in the usual terms, with regard to discovery. The Renova parties duly produced a list of documents dated October 1st, 2010 which indicated in general terms that they no longer had in their possession, custody, or power documents which had been destroyed and could not now be recovered. However, 10 days later, on October 12th, 2010, Maples and Calder wrote to the attorneys for the Gilbertson parties, Appleby, stating that, as a result of a server crash which had occurred at the Renova Group's premises in Zurich in January 2008, the Renova parties were not in a position to identify, list, or produce copies of any relevant documents that had been stored electronically on the Zurich computers and that such documents were not capable of being recovered. This significant problem had not been intimated to the Gilbertson parties or their advisers previously.

18. Over the next few months it became apparent that the Renova Group's I.T. staff had, at various times following the Zurich server crash, deleted or destroyed all available sources or copies of electronic data which had been on the Zurich server prior to the crash, and that in most instances, such deletion and destruction had taken place after the commencement of these proceedings. I will elaborate on that later in this ruling.

19. As a result of their increasing concerns about the steps taken by the Renova Group, and having obtained advice from experienced, independent I.T. experts, the Gilbertson parties applied to the court, *inter alia*, for further and better lists of documents to be produced by each of the Renova parties, verified by affidavit by each of them, and for orders for the preservation of all potentially relevant electronic data and all potentially relevant computer hardware on which such data may be stored held by the Renova parties and each of them. They applied also for orders relating to the steps taken by Maples and Calder in relation to the Renova parties' discovery.

20. Following a contested hearing on November 25th, 2010, during the course of which counsel for the Renova parties indicated that they were proposing imminently to instruct independent I.T. experts themselves, I issued an *ex tempore* ruling on November 30th, 2010, which I think I should quote in full:

"The court has already ruled that this matter should be tried with full discovery, examination and cross-examination of witnesses in the

usual way and the trial is now listed for June 8th, 2011 [since postponed] for a period of 6 weeks.

In order for justice to be done, and be seen to be done, by a fair trial of the issues, it is essential that all of the parties to the claim and the counterclaim list and produce for inspection by way of discovery all documentation that is in any way relevant to the issues in dispute, which are or have been in the possession, custody, or power of the party concerned. Documentation includes e-mail communications, notes and memos of meetings and discussions, including telephone conversations, *etc.*, whether in hard copy or electronic form on any computer server, laptop, or handheld device of any kind wherever they may be. This is so whether or not such documentation is considered by the party to be important or to be helpful or unhelpful to his case. This is the law in this jurisdiction, as it is in England, and it is considered by the court to be a serious breach by any party, with serious consequences, not to give full and proper discovery. In the case of a corporate party this will include giving discovery of any relevant documentation which is or has been in the possession or custody of any director, officer or employee such as, in the present case, Mr. David Kalberer.

It is also the professional duty of a party's lawyer in this country, as an officer of the court, to ensure, as far as reasonable, that the party whom he or she represents clearly understands and acts upon the requirement to give full and proper discovery. That professional duty may require a party's lawyer to go somewhat further in this respect in the case of a foreign party, who may not understand and/or appreciate the rationale for and the nature and extent of the obligation to give full and proper discovery of all documentation relating to the issues in dispute and to whom the obligation to list and produce documents which seem to go against his own case or which seem to help the case of the opposing party may be unattractive and seem contrary to his own interests.

This is not intended to be a comprehensive and full ruling, but having reviewed the affidavit evidence and considered the skeleton arguments, the law and authorities cited, and heard the oral submissions of counsel, it seems to me that there is a probable lack of discovery by the plaintiff and each of the four defendants to the counterclaim (together 'the Renova parties'). There are issues in this case in respect of which in all probability there would have been a significant number of internal communications and discussions as between the Renova parties and each of them (and in the case of the corporate Renova parties their beneficial owners, directors, officers, and employees) and as between each of them and other members of the

Renova Group. The issues in dispute in the claim and the counterclaim are well known to all the parties but in the absence of full and specific explanation by affidavit by each of the Renova parties it is not easy to accept that there is not a substantial amount, and never has been, of internal documentation relating in any way to these issues. For example, it seems most probable that there would have been considerable internal communication and discussion concerning the significant decision not to finance the proposed purchase of the Fabergé rights from Unilever as originally intended unless ownership of those rights was to be held by a different Renova Group company, Lamesa Arts Inc., outside the Pallinghurst structure. It is similarly unconvincing that there were not a number of internal communications within the Renova Group concerning whether the proposed acquisition of the Fabergé rights was or was not, or should or should not, be within the Pallinghurst structure, and subsequently concerning the decision to take the approach set out in the letter dated May 25th, 2007 that it had never been intended that the Fabergé rights should be held within the Pallinghurst structure. These are just examples of issues concerning which internal documentation seems most likely to have been created, of which there is a surprising lack listed, but which still may exist or at least must have existed and which if appropriate searches and steps had been taken would have been discovered and even now may possibly be ascertained and listed by further and better lists.

The Renova parties claim that the lack of documentation currently listed is mainly due to a computer server crash in the Renova Group's office in Zurich in January 2008. This is explained in an affidavit of Mr. Igor Cheremikin, Chief Legal Officer of the Renova Group's management company, sworn in Moscow on November 18th, 2010. Mr. Cheremikin also purports to explain, on a hearsay basis of course, the steps taken by the Renova Group I.T. personnel following the crash, as a result of which, he says, no further documentation is available from that server or from back-up tapes kept both on and off-site. I agree with counsel for the two defendants and plaintiffs in the counterclaim (together 'the Gilbertson parties') that these explanations are insufficiently detailed and specific, leave significant gaps and unanswered questions, and are not sufficient to resolve the concerns which arise about the apparent lack of discovery. Nor does the affidavit satisfy the concerns to which it gives rise also in relation to what was done by the Renova Group I.T. personnel following the server crash and why specialist forensic data recovery experts were not used and data destroyed. There is cause for concern also about the apparent failure of the Renova parties to actively pursue possible alternative sources of relevant data in Switzerland, Russia, the Bahamas, the United States, and Cyprus. It seems

possible that relevant data may still possibly be in the custody, possession, or power of the Renova parties, or one or more of them, accessible from computers, servers, or electronic handheld devices and the like in any of those places, particularly Russia.

These concerns and possibilities are largely identified and discussed in a report by Mr. Steve Buddell dated November 23rd, 2010, which is exhibited to the fifth affidavit of Mr. Jeremy Kosky of Clifford Chance, the London solicitors for the Gilbertson parties. Mr. Buddell is an independent computer expert specializing, *inter alia*, in forensic recovery and re-constitution of electronic data, and resolving problems of the sort identified by Mr. Cheremikin as arising from the computer crash in Zurich. I found Mr. Buddell's report very helpful in setting out various ways in which it may still be possible to recover relevant data, particularly e-mails, apparently lost as a result of the crash and as a result of the somewhat surprising steps taken by the Renova I.T. personnel thereafter, including their apparently deciding themselves, without any guidance, which data was not 'important' and could therefore be deleted.

In the circumstances, it is, in my opinion, now incumbent on each of the Renova parties, having regard to my comments and the analysis and suggestions in Mr. Buddell's report, and I order each of them, to serve a further and better list of documents, verified in each case by affidavit by the relevant party personally, and, in the case of a corporate party, by a director who is willing and available to give evidence at the trial. In order that the Renova parties should each have sufficient time to obtain and utilize the services of an independent forensic computer expert to assist them to comply with their discovery obligations and with the court's order, should they be advised to do so, I will allow them until January 11th, 2011 to serve such further and better lists and verifying affidavits.

It goes without saying that each of the Renova parties, including by their respective beneficial owners, officers, employees, agents and other members of the Renova Group, must take all steps necessary to preserve all computers, servers, back-up tapes, handheld electronic devices or other means of transmitting or receiving data and all or any data which they are advised may be relevant which is held or stored on, or by, any such or similar means in any jurisdiction whatsoever, and I also so order to that effect with a penal notice to be attached.

I direct, too, that each of the Renova parties shall produce a detailed log (with technical assistance if necessary, such technical assistance to be specifically identified) identifying precisely the nature, the medium (whether encrypted or unencrypted) and the exact location

of all such means of transmitting, receiving, or storing data and the data which is, or was, thereon which they have been advised may be relevant, as referred to above, such log to be exhibited in each case to the affidavit sworn in verification of that Renova party's further and better list.

In the particular circumstances, I do consider it appropriate that the partner of Maples and Calder responsible for the conduct of this case on behalf of the Renova parties shall, at the same times as service of further and better lists by each of the Renova parties as I have ordered, serve an affidavit explaining the precise steps taken by each of the Renova parties in compliance with this order and when, where and how such steps were taken. I therefore make an order to that effect.

In light of my rulings above, the costs incurred by the Gilbertson parties in respect of, and occasioned by, their summons dated November 5th, 2010 shall be paid by the Renova parties in any event, such costs to be taxed if not agreed."

21. In light of this, and following certain further negotiations between the parties, I made the November 30th order to which I have already referred.

22. Following the November 30th order, further and better lists, verified by affidavit, were produced by the corporate Renova parties, but separate lists, verified by affidavit, were not produced by the individual Renova parties, Mr. Vekselberg and Mr. Kuznetsov. Other affidavits were also filed on behalf of the Renova parties in light of the terms of the order. In light of the failure of the individual Renova parties to comply strictly with the November 30th order there followed a further contested hearing, following which I made the April 7th order with which Mr. Vekselberg and Mr. Kuznetsov then complied by submitting verifying affidavits.

23. I should also note that according to the affidavit evidence of the Renova parties, subsequent to the advice given to the Renova Group concerning the need to preserve relevant documents which they received in January 2007, to which I have already referred above, the Renova parties did not receive any further advice from, or have any discussions with, either Jones Day or Maples and Calder concerning discovery until October 2009, after the filing of the Renova parties' reply and defence to the Gilbertson parties' defence and counterclaim. The advice which they were given then is also, of course, privileged but the concerns which were subsequently brought to my attention concerning the steps taken or not taken by the Renova parties' attorneys in relation to discovery are clearly reflected in my *ex tempore* ruling dated November 30th, 2010, quoted above.

**The steps taken by or on behalf of the Renova parties**

24. I do not propose to rehearse in great detail the steps taken by the Renova Group I.T. department following the Zurich server crash in January 2008. They are the subject of detailed discussion, analysis and comment by the parties' respective I.T. experts, much of which is of a technical I.T. nature. The Gilbertson parties' criticisms thereof, and the Renova parties' explanations, are exhaustively set out in the various affidavits, as well as the experts' reports, which were filed and relied upon in the course of the four-day hearing before me. They are also canvassed at length and in detail in the parties' respective skeleton arguments. In summary, however, the Gilbertson parties' complaints are largely based upon the destruction of all sources of data following the crash of the Renova Group's server in Zurich, which was the principal source of historic e-mails, in particular the following:

    (a) **The Zurich server crash:** This occurred on January 24th, 2008, some four months prior to the commencement of these proceedings. There is no evidence, and it was not suggested, that this crash was anything other than accidental, but it is the steps taken by the Renova Group following the crash that are heavily criticized by the Gilbertson parties as being inconsistent with the Renova parties' discovery obligations and their obligation to preserve documents and the sources of documents in particular. Following the crash, it is said that the Renova I.T. staff were under pressure to restore e-mail services as soon as possible and, accordingly, the data on the original crashed server's e-mail database was deleted in order to enable this. The Renova parties' evidence is that this was considered an appropriate solution at the time, as the Renova I.T. staff are said to have believed that they would be able to restore the deleted data from other sources, in particular certain back-up tapes (referred to at (b) and (c) below). Furthermore, before deleting the original e-mail database, the I.T. staff copied the content of the crashed sever onto a decommissioned server in Moscow (referred to at (d) below). The Renova Group then went on to re-use the failed Zurich server after the crash and deleted the original database to enable such re-use. Later, from December 2009 onwards, the Renova Group used the failed Zurich server for mail-forwarding purposes. This required the I.T. department to re-configure the hardware and to install new system files on the crashed server, the effect of which was to further reduce significantly the possibility of repairing and recovering any original deleted data. Although the parties' I.T. experts agree that it may have been originally possible to recover e-mail messages, the consequence of the Renova Group's continued use of the failed Zurich server during 2008 and 2009 meant that any potentially recoverable e-mail data would have been overwritten and so rendered irrecoverable. The Renova Group did not consult any I.T. experts until shortly

before my *ex tempore* ruling in November 2010, almost three years after the server crash.

(b) **The back-up tapes:** The data stored on the Zurich server was, as a matter of course, stored and duplicated on encrypted back-up tapes daily, weekly, monthly, and annually. Access to the data stored on the encrypted back-up tapes required the use of three passworded "keys." Some time after August 2008, that is after the commencement of these proceedings, the Renova Group, through their I.T. department, took the decision to destroy the encrypted back-up tapes because one of the holders of the password encrypted keys (Mr. Cheremikin) had lost his password and, it is said by the Renova parties, access to the data on the back-up tapes was therefore no longer possible. It was apparently thought by the Renova Group I.T. department that important data held on the Zurich crashed server would have been saved to network desktop folders which would not have been adversely affected by the server crash.

(c) **Unencrypted copy of Zurich server database:** This separate unencrypted copy of the database, which was additional to the encrypted back-up tapes mentioned above and additional to the decommissioned Moscow server copy, was made after the server crash in order to enable the defragmentation of the database. However, it appears, for unexplained reasons, that the defragmentation process was not successful and the Renova parties' evidence is that once again the Renova Group I.T. personnel went on to destroy the unencrypted copy of the original Zurich server data as well.

(d) **The decommissioned Moscow server:** As already mentioned, the database of the failed Zurich server was copied by the Renova Group I.T. department onto a decommissioned server in Moscow. However, the Renova Group subsequently installed other software on that server to enable it to be used for testing purposes, as a result of which the copy of the failed Zurich server database was overwritten and the possibility of successfully recovering any e-mails over the period 2005 to 2007 from the Moscow server was consequently precluded. The evidence of the Renova parties' own expert is that this overwriting occurred on December 4th, 2009, February 10th, 2010 and November 26th, 2010.

(e) **Deletion of the logical drive:** The Renova parties' evidence is that the logical drive of the crashed Zurich server was deleted by the Renova Group I.T. personnel on, or after, December 1st, 2010, that is after para. (iii) of the November 30th order was made. This deletion had the effect of further frustrating any attempt to recover the original deleted data from the crashed Zurich server. On later re-examination by the Renova parties' own I.T. experts, a number of folders (but not files) with names apparently relating to the Pallinghurst structure were identified. It is not clear whether these folders ever contained user-created files. The suggestions made and

issues raised relating to the logical drive by the parties' respective I.T. experts differ, but it does appear that questions concerning the potential recovery of data by this means are unanswered by the Renova Group I.T. department.

25. The upshot of all this is that it is accepted that the Renova I.T. department took a series of very significant decisions in the period January 2008 to December 2010, which has resulted in the effective eradication of all potential sources of any relevant electronic documentation saved on the crashed Zurich server. The evidence of the Gilbertson parties' independent I.T. experts, which is not disputed in this respect by the Renova parties' own independent I.T. experts, is that it would not have been difficult or expensive for the Renova Group to make different decisions at the time which would have ensured that all of the potential sources of data concerned were preserved for expert forensic examination, particularly given that these proceedings were clearly in contemplation at the time of the Zurich computer crash and commenced shortly thereafter, and given also that the Renova Group had already received legal advice prior to the server crash that they should preserve all relevant documentation for purposes of these proceedings. Notwithstanding that advice, the Renova Group took deliberate steps, in most instances after these proceedings had commenced, which destroyed any prospects of recovering for discovery purposes e-mail and other electronic data from any potential sources, apparently without any regard for their discovery obligations and the need to preserve any potentially relevant e-mails and other documents.

26. The Gilbertson parties also complain about other aspects of the Renova parties' discovery. They point to the complete absence of notes, memoranda and working documents. For example, they are cynical of Mr. Kalberer's evidence that it was his practice to dispose on a regular basis of all his working documents, handwritten notes, *etc.*, made on or in connection with draft agreements so that he is unable to now discover any such material. An example of this relates to the period between late December 2006 and early January 2007, when negotiations were taking place between Mr. Gilbertson on one hand, and Mr. Vekselberg (through Mr. Kuznetsov and Mr. Kalberer) on the other hand, regarding the various drafts of the proposed implementation agreement. Mr. Kalberer, was directly involved in the drafting and revised drafting of the proposed terms. However, he was on vacation in Brazil at the time and was taking instructions from Mr. Kuznetsov, who was presumably in Zurich, or possibly in Moscow, with Mr. Kalberer then implementing such instructions in his drafting on his laptop. It does seem rather improbable that Mr. Kalberer would not have made detailed notes of his discussions with Mr. Kuznetsov and of the various proposals discussed so that he could then incorporate them in the draft on his laptop. I find it somewhat surprising that Mr. Kalberer, as a lawyer, would not have retained those notes (and

indeed his notes relating to other instructions, for example relating to the drafting of the letter agreement), if only for his own protection. However, Mr. Kalberer's affidavit evidence is that his practice was to destroy his earlier drafts and this, of course, occurred prior to the commencement of these proceedings, although possibly in some instances after they were in contemplation.

27. The Gilbertson parties also complain about Mr. Vekselberg's failure to give discovery of any e-mails received on, and possibly sent from, e-mail addresses, other than his Renova addresses, used by him. He accepts in his evidence that "people" sent him e-mails to such addresses which related to his personal business, such as the acquisition of the Fabergé rights. One such e-mail address is Mr. Vekselberg's TNK-BP e-mail address. The probability, based on his evidence, is that Mr. Vekselberg's TNK-BP e-mail account contained relevant e-mails. Mr. Vekselberg is an executive director and a member of the board of TNK-BP, but he has declined to take any steps to obtain access to his personal historic e-mails from his TNK-BP address over the relevant period. His reason for not doing so is that there is a dispute, the subject of arbitration, between the consortium of which Renova is a member on the one hand and BP on the other hand which affects TNK-BP. Mr. Vekselberg considers that, in the circumstances, it would not be "appropriate" for him to request TNK-BP's I.T. department to spend company time and resources in searching TNK-BP's computer systems for his personal e-mails relating to these proceedings, which have nothing to do with TNK-BP. Mr. Vekselberg says that he is not in a position to make such a request in the current environment in which his relationship with TNK-BP is very strained. He contends that any such documents are accordingly not in his possession, custody, or power. There seems to have been no objection on the part of TNK-BP to Mr. Vekselberg using his e-mail account for personal business purposes and, notwithstanding the ongoing arbitration, I find it hard to see why, as an executive director and board member, he should not be able to obtain access to such historic personal e-mails which are unrelated to the business of TNK-BP and unrelated to the arbitration. I do not find the Renova parties' submissions in this regard particularly compelling. In my view, the overall impression given is that Mr. Vekselberg either does not understand or accept, or does not wish to understand or accept, the requirement to use his best endeavours to obtain access to such e-mails so as to comply with his discovery obligations in the present proceedings, which he has procured the plaintiff to initiate.

28. Mr. Vekselberg is also a non-executive director and chairman of the board of a Jersey company, known as RUSAL, which is the successor to a company known as SUAL. The evidence of the Renova parties is that Mr. Vekselberg also used his SUAL e-mail address at times for personal business, including in relation to the issues in these proceedings. Mr.

Vekselberg's objection to disclosure of e-mails sent to and from that e-mail address is based on Jersey law advice that he does not have a legal right to require RUSAL to carry out a search of its I.T. systems for potentially relevant historic e-mails on his SUAL account. He therefore says that any such e-mails are also not in his possession, custody, or power. The Gilbertson parties' position in this regard is effectively the same as it is in relation to Mr. Vekselberg's TNK-BP e-mail account. They argue that there is no evidence that Mr. Vekselberg was prohibited by SUAL from using his SUAL e-mail address for corresponding in regard to matters unconnected with SUAL's business. They contend that, indeed, it is to be presumed that he had SUAL's consent to use his e-mail address for personal business in the way that he did. They submit that, in those circumstances, SUAL's consent can be taken as extending to Mr. Vekselberg having access to personal e-mails which he was permitted at the time to receive and/or send. In this instance, Mr. Vekselberg has written to RUSAL requesting copies of his e-mails over the relevant period but no response has yet been received. In the absence to date of a response from RUSAL to Mr. Vekselberg's letter, the final factual position is not known but, once again, the overall impression given, in my view, is that, notwithstanding that the November 30th order expressly required Mr. Vekselberg to list in his list of documents all documents, "*including e-mails or other data sent to or from any e-mail address used by him*" [Emphasis supplied.], Mr. Vekselberg has been less than enthusiastic in complying with the terms of that order. I am somewhat cynical about the explanation which he has given for his contention that such e-mails are not within his possession, custody, or power.

29. The Gilbertson parties also contend that potentially relevant e-mails are likely to be held on e-mail accounts of Mr. Vekselberg's daughter, Irina Vekselberg ("Irina"). Mr. Gilbertson and his associates had e-mail exchanges with Irina at relevant times in relation to the matters which are the subject of these proceedings. Irina was apparently employed by a company within the Renova Group and took a personal interest in the acquisition of the rights. The Renova parties have not objected to disclosure of e-mails on Irina's Renova Group e-mail address but they do object to the discovery of e-mails or other documents sent to or from her personal e-mail address on the ground that any such e-mails are not in their possession, custody, or power. This is based on Russian law evidence that the Renova parties do not have a legal right under Russian law to compel Irina to produce any such documents on her personal e-mail account for the purposes of discovery in these proceedings. However, Russian law evidence obtained by the Gilbertson parties indicates on the contrary that there are two grounds upon which the Renova parties could lawfully require Irina to disclose e-mails sent to her personal e-mail address which relate to the issues in dispute. However, to my mind, the question of discovery of potentially relevant e-mails on Irina's personal

e-mail account is very peripheral to the main issues in this dispute. Its resolution would require determination of which Russian legal advice the court should prefer in the absence of cross-examination, and I do not consider a trial on that issue to be appropriate as part of what is, after all, an interlocutory application, which even without that issue, in my opinion, took inappropriately long. I therefore do not consider it necessary for the determination of this application to express any opinion on the position with regard to e-mails sent to or from Irina's personal e-mail address.

**The parties' contentions**

30. The Gilbertson parties contend that it is highly probable that there were internal e-mail exchanges between the Renova parties, and between them and other Renova Group employees, concerning the issues in the case. They point out that the Renova Group is a large international conglomerate with significant business interests in various countries which advertises its—

"global corporate governance standards and advanced global production and management technologies and its standardization and documentation of key management proposals . . . aimed to improve management decision making quality."

31. Furthermore, the Gilbertson parties point out that the Renova parties' own evidence shows that they did, in fact, use e-mail to communicate with the Gilbertson parties and to copy such communications internally to each other. They contend that, in the circumstances, it is most likely that there were internal e-mail communications between the Renova parties themselves, and between them and other individuals within the Renova Group, such as Mr. Cheremikin and Mr. Kalberer, who were located in different countries and different time zones. They also contend that the probabilities are that any such internal e-mail communications were saved on the e-mail database of the Zurich server which crashed in January 2008. The Zurich offices were the principal Renova Group headquarters outside Russia and the evidence of Mr. Vekselberg, Mr. Kuznetsov, and Mr. Kalberer is that they all deleted e-mails from their own various individual computers, whether desktop, laptop or handheld, because such e-mails would be saved on the central Zurich server database.

32. The principal criticism made by the Gilbertson parties is that the Renova parties were in serious breach of their discovery obligations in knowingly destroying all of the various potential sources of data deriving from the crashed Zurich server, thereby rendering any potential subsequent recovery by I.T. experts impossible. They emphasize that the Renova Group, through its Chief Legal Officer, Mr. Cheremikin, in Moscow, and its Deputy Chief Legal Officer, Mr. Kalberer, in Zurich, were specifically advised by their Cayman and/or their London lawyers of

the need to preserve relevant documents when this litigation was first in contemplation in January 2007, and that the Renova parties were further advised to that effect again in October 2009. The evidence of Mr. Cheremikin is that the Renova Group I.T. department was informed of the need to preserve relevant documents, although, it is, the Gilbertson parties say, obvious that this advice was either ignored or at least not acted upon.

33. It was submitted on behalf of the Gilbertson parties that, in these circumstances, there is a resulting substantial risk that a fair trial is not possible. They contend that the Renova parties' lack of proper discovery, indeed lack of almost any discovery, of documents relevant to the issues in the case means that there is a serious risk that there cannot be a fair trial. Although they do not contend that the Renova parties' failure to give full and proper discovery is deliberate in the sense of being intended to pervert the course of justice, they do contend that the Renova parties have shown a reckless and culpable disregard for their discovery obligations, and in particular their obligations to preserve relevant documents and the sources of such documents. They submit that, although they accept that striking out the Renova parties' claim is not intended as a punishment for such culpability, nonetheless, since as a consequence of their actions there is a serious risk that a fair trial is not possible, the plaintiff's claim and the Renova parties' defence to the counterclaim should be struck out.

34. The Renova parties contend, first, that the court does not have jurisdiction to strike out in the present circumstances. They argue that GCR, O.24, r.20 is the sole source of the court's jurisdiction to strike out in respect of defective discovery and that therefore such jurisdiction only arises when there has been a breach of an order for discovery, usually an "unless" order. They argue that para. (iii) of the November 30th order is a mandatory injunction order and not an order for discovery of which there has been any breach. They dispute that the court has any inherent jurisdiction over and above the specific jurisdiction created by GCR, O.24, r.20, which they say codifies the court's powers in this respect.

35. The Renova parties also submit that no duties or obligations in respect of discovery arise until an order for discovery is made, in this case that being the July 20th order. They say that, accordingly, in this case the Renova parties had no obligations with regard to discovery until then, and that therefore most of the steps taken by the Renova Group I.T. department following the Zurich computer crash in January 2008 are simply not relevant.

36. It was also argued on behalf of the Renova parties that the steps taken by the Renova Group I.T. department were anyway reasonable in the circumstances, and entirely understandable, and not culpable. In any event, they submitted, there is no evidence either that the e-mail database

of the crashed Zurich server ever contained any e-mails or other documents relevant to these proceedings, or that any data would have in fact been recoverable from the crashed Zurich server, whether from the back-up tapes, from the Moscow server or from the logical drive, even if they had not been destroyed or overwritten. They also point out that the affidavit evidence relied upon by the Renova parties is that the principal individuals concerned did not habitually use internal e-mail anyway, whether to discuss issues such as those which are the subject of the proceeding, or otherwise, and it was not their practice to make or keep notes, memoranda or drafts of documents. This, they say, being the affidavit evidence, it is not, at least in the absence of any cross-examination, open to challenge for purposes of the Gilbertson parties' strike-out application. In any event, it was submitted, the affidavits verifying the further and better lists of documents are conclusive and the court may not go behind them.

37. With regard to Mr. Vekselberg's TNK-BP and SUAL e-mail accounts, the Renova parties contend that Mr. Vekselberg has no legal right in Russia (in relation to his TNK-BP e-mail account) or in Jersey (in relation to his SUAL e-mail account) to demand access to any historic e-mails sent to, or from, those e-mail addresses, and that accordingly such e-mails, if there were any, are not within his possession, custody, or power and are not, therefore, discoverable.

38. Lastly, in this general summary of the parties' contentions, the Renova parties submit that there is no basis in the present case for striking out their claim at this, an interlocutory stage, but that any doubts with regard to discovery should be dealt with at the trial where the court will hear oral evidence and cross-examination and may draw whatever inferences it may consider justified in reaching its conclusion on the merits of the original action and the counterclaim.

**The relevant law**

39. GCR, O.24, r.20 provides as follows:

"(1) Where the Court has made an order for discovery (either of documents or by way of oral examination) against any party and such party fails to comply, the Court may make such order as it thinks just, including, in particular, an order that the action be dismissed or, as the case may be, order that the defence be struck out and final judgment entered accordingly.

(2) If any party against whom an order for discovery is made fails to comply with it, then, without prejudice to paragraph (1), he shall be liable to committal or, where the party is a body corporate, its responsible officer(s) shall be liable to committal.

(3) Service on a party's attorney of an order for discovery made against that party shall be sufficient service to found an application for committal of the party disobeying the order but the party may show cause in answer to the application that he had no notice or knowledge of the order.

(4) An attorney on whom an order made against his client is served and who fails without reasonable excuse to give notice thereof to his client shall be liable to committal."

40. While I was referred to a number of English cases, to which I shall refer in due course, it seems to me proper and appropriate that I should start with the two principal Cayman Islands authorities to which I was referred and which, of course, although not binding on me because they were both cases at first instance, are nonetheless more persuasive in this court.

41. *Brown v. Horvat Properties (Cayman Islands) Ltd. (3)* (Smellie, J. (as he then was)) was a case in which there had been an "unless" order made against the defendants, who were the defaulting parties, with regard to the defendants' failure to give proper discovery. Inevitably, the circumstances were quite different from those in the instant case. However, the learned judge, in considering the relevant principles, said (in the unreported transcript of judgment) that:

"the available case law dealing with the exercise of the court's power to strike out advises that it is not a part of the function of the court to punish the party in default, and cases of contumacious conduct in relation to discovery must, necessarily, be extremely rare.

In the same judgment in which the foregoing observations were cited, Lloyd, L.J. in *Landauer Ltd.* v. *Comins & Co.* [[1991] T.L.R. 382] .. also made the following observations:

'But I can imagine cases of contumacious conduct, such as the deliberate suppression of a document, which might justify the striking out on the analogy of striking out for want of prosecution under Order 25, rule 1(4) even if a fair trial were still possible.'

In the *Landauer* case, it was also confirmed, by the adoption of the test earlier propounded in *Logicrose Ltd.* v. *Southend Utd. F.C. Ltd.* [*The Times*, March 5th, 1988]—

'... that in the absence of contumacious default, the test was whether there was a real or substantial or serious risk that a fair trial was no longer possible. The second dimension related to the prospect of requiring the plaintiff to proceed with the trial without complete discovery from the defendants. While the

Plaintiff's case was patently strong, there was no measure for assessing the possible importance of material which was yet to be discovered. That recourse would therefore not have been an appropriate manner in which to direct the conduct of this somewhat complex litigation. The decision to strike out might, also, properly contain an element of sanction for non-compliance with the order of a Court. The following passage is taken from the decision of the English Court of Appeal in: *Lonrho Plc* v. *Fayed (No.3)* [[1993] T.L.R. at p.34],

"The commonest use of Order 24, r.16 [the RSC equivalent of GCR, O.24, r.20] was to enforce a party's obligation to serve a list of documents; the court would order the claim or defence to be struck out unless discovery was given by a certain time.

If there was a default in the 'unless' order the claim or defence was struck out without more ado. It could also be an effective sanction where admitted breaches had occurred, or it was clear from the parties' own documents there was non-compliance.""

42. In *TMSF v. Wisteria Bay Ltd. (10)* the Chief Justice (Smellie, C.J.) struck out the defendants' defences, again in circumstances which were significantly different from those in the present case. In that case, three separate orders had been made for delivery of the original documentation in issue, which had not been complied with. The last two of those orders were "unless" orders, with which the learned Chief Justice was satisfied the defendants had failed to comply. He went on to say (*2008 CILR 231, at paras. 54–63*):

"54. The case law upon which I will later elaborate (*e.g. Landauer Ltd* v. *Comins & Co.* [[1991] T.L.R. 382]) advises that in circumstances such as these, there is a duty upon the defaulting party to satisfy the court, by an explanation which the court might accept, why it is that it has failed to meet its discovery obligations, and why, even worse in so doing, they breached an "unless" order. And further, why it is then that they should be allowed to continue in the proceedings. The explanations which have been put before me fall woefully short of meeting those requirements. I am compelled to the conclusion that any verdict in favour of the defendants in this case, based on the state of the evidence as the result of their failure to meet their discovery obligations, would be an unsafe verdict. In so concluding, I have primarily in mind the factors first mentioned at the outset of this ruling—that the loan documentation, the very provenance and authenticity of which are in question and which are of pivotal importance to the plaintiffs' case, are those which are now

completely in doubt. And from this, the patently clear and serious risk that some of them at least are being deliberately withheld, or have been deliberately destroyed.

55. As in *Landauer Ltd.* v. *Comins & Co.*, here the circumstances invite the only reasonable inference that, where documents have been deliberately suppressed, they must have been highly material to the issues in the action. And also, as in that case, the unavoidable conclusion is that, in the absence of those documents, justice cannot be done. When this ultimate failure, on the part of the defendants, is taken with the history of proven recalcitrance and prevarication on their part in this case, it is a failure which can, in my view, be regarded only as an abuse of the process of the court. See *Arrow Nominees Inc.* v. *Blackledge* ... where the English Court of Appeal stated ([2001] BCC 591, at paras. 54–55):

'But where a litigant's conduct puts the fairness of the trial in jeopardy, where it is such that any judgment in favour of the litigant would have to be regarded as unsafe, or where it amounts to such an abuse of the process of the court as to render further proceedings unsatisfactory and to prevent the court from doing justice, the court is entitled—indeed, I would hold bound—to refuse to allow that litigant to take further part in the proceedings and (where appropriate) to determine the proceedings against him. The reason, as it seems to me, is that it is no part of the court's function to proceed to trial if to do so would give rise to a substantial risk of injustice. The function of the court is to do justice between the parties; not to allow its process to be used as a means of achieving injustice. A litigant who has demonstrated that he has determined to pursue proceedings with the object of preventing a fair trial has forfeited his right to take part in a trial. His object is inimical to the process which he purports to invoke.

Further, in this context, a fair trial is a trial which is conducted without undue expenditure of time and money; and with a proper regard to demands of other litigants upon the finite resources of the court. The court does not do justice to the other parties to the proceedings in question if it allows its process to be abused so that the real point in issue becomes subordinated to an investigation into the effect which the admittedly fraudulent conduct of one party in connection with the process of litigation has had on the fairness of the trial itself.'

56. Still further, as to the basis upon which the court prevents a defaulting party from continuing with his case (*ibid.*, at para. 58):

'The court does not strike out the petition because it disapproves of the petitioner's conduct; it strikes out the petition because it is satisfied that the petitioner's conduct has led to an unacceptable risk that any judgment in his favour will be unsafe.'

57. Here, I have indicated that I am driven to the conclusion that a fair trial is no longer possible . . .

58. In these circumstances, I must conclude that there is no probability of the defendants complying in good faith with their discovery obligations. This further finding, by itself, would be a sufficient basis for strike out, by reference to the willingness of the courts in the analogous situation of the absence of a *bona fide* defence, to grant summary judgment to the plaintiff. . This is not a conclusion, I might add, which depends upon the court undertaking the sort of 'trial on affidavit evidence,' which was discountenanced in that and other cases . . .

61. For all those reasons. .it is open to me to conclude, on the balance of probabilities, that no satisfactory explanation has been given for the continuing absence of the second set of originals, from these proceedings. That then leads also to the unavoidable conclusion that the second defendant . . is also in contumacious breach of the 'unless' orders of this court. So also, must the defendants altogether . . . be regarded as having failed to meet their general discovery obligations imposed by the Grand Court Rules 1995, O.24, r.20, in this action.

62. In such circumstances, plaintiffs are not to be invariably required to show that there is a real risk of prejudice to their case, before the sanction of striking out can be imposed upon the defendants. That sanction is justified by the deliberate and inexcusable nature of the breach itself . . .

63. For all the foregoing reasons, I conclude—and even with concerns as to the need for proportionality of the just sanction in mind. . that there is a real risk that the conduct of the defendants has rendered further conduct of the proceedings unsatisfactory (a conclusion of principle reached by Millett, J., as he then was, based on similarly serious concerns in *Logicrose Ltd.* v. *Southend Utd. F.C. Ltd.* [132 Sol. Jo. 1591]. The defendants have therefore, in my view, entirely forfeited their right to continue to defend, or to sue, in these proceedings. I order that their defence and counterclaim be struck out."

43. The three principal English authorities referred to by the Chief Justice in the two Cayman cases from which I have quoted above were

*Logicrose Ltd.* v. *Southend Utd. F.C. Ltd.* (8) ("the *Logicrose* case"), *Landauer Ltd.* v. *Comins & Co.* (7) ("the *Landauer* case") and *Arrow Nominees Inc.* v. *Blackledge* (1) ("the *Arrow Nominees* case"). I was also referred by both leading counsel at the hearing before me to *Douglas* v. *Hello! Ltd.* (5) ("the *Douglas* v. *Hello!* case"). Although leading counsel referred me to other cases both in their extensive written skeleton arguments and in their oral submissions, to some of which I will refer later, these four English cases, although of course not binding on me, are the English authorities which I found of most assistance.

44. The *Logicrose* case (8) concerned an application by the defendants during the course of the trial of the action and shortly before the conclusion of the plaintiffs' case for an order that the action be dismissed and the defence to the counterclaim struck out pursuant to RSC, O.24, r.16, on the ground that the plaintiffs had failed to comply with the requirements for discovery. The basis for the application was summarized by Millett, J. (as he then was) as follows (*The Times*, March 5th, 1988):

"It is alleged that Mr. Harriss, who is the principal director and shareholder of the plaintiffs (and has been their principal witness), has not merely failed to disclose the existence of a crucial document in his possession or power, but that, having obtained it during the course of the trial (and, indeed, during the course of his cross examination), he deliberately suppressed it and, for a time, successfully concealed its existence from the court.

That is a very serious allegation indeed. If true, it would deserve the serious consequences for which the defendants ask, but it must be clearly proved. Despite Mr. Nugee's submissions to the contrary on behalf of the plaintiffs, I am satisfied that it does not have to be proved in accordance with the criminal standard of proof. Deliberate disobedience of (*sic*) a peremptory order for discovery is no doubt a contempt and, if proved in accordance with the criminal standard of proof, may, in theory at least, be visited with a fine or imprisonment. But to debar the offender from all further part in the proceedings and to give judgment against him accordingly is not an appropriate response by the court to contempt.

It may, however, be an appropriate response to a failure to comply with the rules relating to discovery, even in the absence of a specific order of a court, and so in the absence of any contempt, not because that conduct is deserving of punishment but because the failure has rendered it impossible to conduct a fair trial and would make any judgment in favour of the offender unsafe.

In my view a litigant is not to be deprived of his right to a proper trial as a penalty for his contempt or his defiance of the court, but only if his conduct has amounted to an abuse of the process of the court

which would render any further proceedings unsatisfactory and prevent the court from doing justice. Before the court takes that serious step, it needs to be satisfied that there is a real risk of this happening."

45. Having set out in detail the factual circumstances and counsel's submissions concerning the missing document, which had eventually been produced, Millett, J. continued (*ibid.*):

"The object of Order 24, r.16 is not to punish the offender for his conduct, but to secure the fair trial of the action in accordance with the due process of the Court (see *Husband's of Marchwood Ltd.* v. *Drummond Walker Developments Ltd.*, [1975] 2 All E.R. 30, [1975] 1 W.L.R. 603). The deliberate and successful suppression of a material document is a serious abuse of the process of the court and may well merit the exclusion of the offender from all over participation in the trial. The reason is that it makes the fair trial of the action impossible to achieve and any judgment in favour of the offender unsafe ... But I do not t hink that it would be right to drive a litigant from the judgment seat without a determination of the issue as a punishment for his conduct, however deplorable, unless there was a real risk that that conduct would render the further conduct of proceedings unsatisfactory. The court must always guard itself against the temptation of allowing its indignation to lead to a miscarriage of justice."

46. The *Landauer* case (7) was an appeal from an order of the judge below striking out the plaintiff's claim for failure to comply with its discovery obligations. The plaintiff conceded that it was in breach of its discovery obligations in that a number of relevant documents were not at first listed in its list of documents and had since been destroyed. In giving the judgment of the English Court of Appeal, Lloyd, L.J. said that there was no doubt that the judge had jurisdiction to make the order (striking out the plaintiff's claim) which he did, but that the question was whether he should have exercised his discretion to strike out in that case. In the particular circumstances on which the plaintiff's claim were based, the Court of Appeal said that it was clear that the state of knowledge of the plaintiff's managing director (a Mr. Axford) was going to be of critical importance to the success of the plaintiff's claim at trial. Some of the most relevant parts of this judgment were quoted in the Cayman cases to which I have referred above and I shall not repeat them, but Lloyd, L.J. explained (*The Times*, August 7th, 1991):

"The writ was issued on 2nd August 1986. On 11th September 1987, the plaintiffs furnished their first list of documents. The list was defective, since a number of relevant documents were omitted altogether. Some of these documents had already been destroyed.

Others were destroyed later. The destruction took place in three phases. The first phase was as a result of a policy of destruction initiated in October 1986, a few months after the writ was issued. Further destruction took place in February 1989, when the plaintiffs moved their offices. The final phase was in June 1990, when Mr Axford retired.

There is an issue between the parties as to the plaintiffs' state of mind when carrying out their policy of destruction. The defendants do not say that the plaintiffs deliberately destroyed documents which they knew to be relevant to these proceedings in order to prevent them coming to the eyes of the defendants. But they do say, or any rate did say in the court below, that the plaintiffs carried out their policy of destruction in knowing disregard of their discovery obligations. In other words, they destroyed these files without first checking the files to see whether they contained any relevant documents. That applied particularly to documents destroyed by Mr. Axford in June 1990, despite advice which the plaintiffs had received from their solicitors . . .

It was common ground that the question he [the judge] had to ask himself was whether there was a real or substantial or serious risk that a fair trial was no longer possible. This was the test which had been adopted by Millett, J. in [the *Logicrose* case (8)] and followed by Mummery, J. in *Assoc. Newspapers Group PLC* v. *Insert Media Ltd.* [[1990] 1 W.L.R. 900]. In neither of those cases was the plaintiff's claim struck out, since in both cases the documents in question were eventually produced. So far as we have been told, this is the first occasion on which a claim has been struck out for breach of a discovery obligation."

47. Having rejected two of the grounds of appeal, which are not material for present purposes, the Court of Appeal went on to consider whether the appellants/plaintiffs had established that the judge was plainly wrong in striking out the plaintiff's claim. In this regard, the court considered first whether they could go behind the plaintiff's evidence, there having been no application to cross-examine the plaintiffs' witnesses on their affidavits. The Court of Appeal was persuaded that they could do so, principally because the plaintiff's own evidence disclosed documents of the type which the court would have expected to be in Mr. Axford's destroyed files, and which were the type of document, in the opinion of the Court of Appeal, which could prove vital in cross-examination of the plaintiff's witnesses on the "all important question of their knowledge." The Court of Appeal also concluded that Mr. Axford's own affidavit evidence showed that documents relating to the issues in the case would have been expected to be found on the destroyed files. Lloyd, L.J. concluded as follows (*ibid.*):

"In the light of those three considerations, the judge was, in my view, fully entitled to find that there was a serious risk that essential documents may have been destroyed in this case, as a result of which a fair trial of the action is no longer possible, that being the test which he had been invited to apply. He was therefore entitled to hold that the appropriate response was to strike out the plaintiff's claim. At all events, it cannot be said that the judge was plainly wrong in doing so. In reaching that conclusion I assume in the plaintiff's favour that the destruction of the documents was, as Mr. Axford says, merely inadvertent. So on that short ground, I would dismiss the appeal.

There was, however, some discussion and argument before us as to what would have been the position if the documents had been destroyed in knowing disregard of the plaintiffs' obligation as to discovery. I find some difficulty in seeing how, if the sole question is whether a fair trial can still be held, the conduct of the plaintiffs in destroying the documents, whether it was merely inadvertent, or whether it was in knowing disregard of their obligation as to discovery and therefore more blameworthy, can be fitted into the equation. But the question does not arise in the present case. It will need careful consideration when it does arise."

48. The *Arrow Nominees* case (1), before the English Court of Appeal, concerned, in brief summary, the question of whether an unfair prejudice petition brought under the English Companies Act 1985 should be struck out on the ground that disclosure of forged documents made a fair trial impossible. There were two applications by the respondents to strike out the petition, the first prior to the hearing of the petition, and the second during the hearing of the petition. In the leading judgment Chadwick, L.J. (now President of the Cayman Islands Court of Appeal) explained the first application to strike out as follows ([2000] C.P. Rep. 59, at para. 30):

"The revelation that disclosed documents had been falsified led the Blackledge respondents to apply to strike out the petition. The hearing of that application before Mr Justice Evans-Lombe extended over three days, concluding on October 25th, 1999. In the judgment which he handed down on November 2nd, 1999, the judge referred to Nigel Tobias' actions as 'conduct of the most profound dishonesty, involving what was obviously a careful and deliberate strategy on his part to perpetrate a fraud on the court ...' But the judge was not satisfied that what was presented to him as the past conduct of Nigel Tobias justified the Draconian course which he was being invited to take; namely, to strike out the petition."

49. In addition to the comments already quoted, Chadwick, L.J. said (*ibid.*, at paras. 54–61):

"54. ... [F]or my part, I would allow that appeal on a second, and additional, ground. I adopt, as a general principle, the observations of Mr Justice Millett in *Logicrose Ltd.* v. *Southend Utd. F.C. Ltd.* [143 Sol. Jo. 1591] that the object of the rules as to discovery is to secure the fair trial of the action in accordance with the due process of the Court; and that, accordingly, a party is not to be deprived of his right to a proper trial as a penalty for disobedience of those rules—even if such disobedience amounts to contempt for or defiance of the court—if that object is ultimately secured, by (for example) the late production of a document which has been withheld.

. . .

56. In my view, having heard and disbelieved the evidence of Nigel Tobias as to the extent of his fraudulent conduct, and having reached the conclusion (as he did) that Nigel Tobias was persisting in his object of frustrating a fair trial, the judge ought to have considered whether it was fair to the respondents—and in the interests of the administration of justice generally—to allow the trial to continue. If he had considered that question, then—as it seems to me—he should have come to the conclusion that it must be answered in the negative. A decision to stop the trial in those circumstances is not based on the court's desire (or any perceived need) to punish the party concerned; rather, it is a proper and necessary response where a party has shown that his object is not to have the fair trial which it is the court's function to conduct, but to have a trial the fairness of which he has attempted (and continues to attempt) to compromise.

. . .

58. To suggest that the basis on which the court acts, when deciding to strike out a petition on the ground that there is a substantial risk that a fair trial has become impossible as the result of a petitioner's conduct, is founded upon the court's determination that a petitioner of whose conduct it disapproves should be denied discretionary relief is to misunderstand the position in a fundamental respect.

. . .

61. .. I should not leave the matter without this comment. The judge's observation, in the final paragraph of his first judgment, that in the course of the trial further evidence emerges that other documents have been suppressed or fraudulently altered, the application to strike out can then be renewed and is highly likely to be successful' must be taken to have led, in some measure, to the trial thereafter taking the course that it did. It seems to me that it may well be more satisfactory, in a case where there has been admitted forgery or destruction of relevant documents, to decide—on the

application to strike out—whether the full extent of the fraudulent conduct has been revealed, even if that requires oral evidence at that stage. The judge recognised that cross-examination could have been sought on the application in October 1999. It is, of course, a matter of case management for the judge in each case whether to invite cross-examination on an interlocutory application, or to leave the point until trial. But I venture to suggest that a judge faced with an application to strike out in circumstances such as those in the present case ought to address the question whether the better course would not be to resolve the issue, before the trial begins (or, perhaps, as a preliminary issue at the start of the trial), whether full disclosure of the fraudulent conduct has been made. If, in the absence of cross-examination, the judge cannot resolve that issue at the interlocutory stage, then he is left in the position that he cannot be confident that there is no substantial risk that the trial (if it proceeds) will be a fair trial. Indeed, he can be reasonably confident that it will be unfair—in the sense that it will give rise to a detailed examination of issues which ought not, properly, to be occupying the time of the court at the trial. If, on the other hand, he is able to resolve that issue before trial (after cross-examination if necessary) then it will not require further investigation at the trial. If the judge is satisfied, in the light of what he accepts is full disclosure, that there is no substantial risk that the admitted forgery or destruction of documents will lead to a result which is unsafe then he will allow the trial to proceed. But, if he is not satisfied that there has been full and frank disclosure of the fraudulent conduct, then, for the reasons which I have already given, it seems to me that the correct response is to refuse to allow the party in default from taking any further part in the proceedings—with whatever consequences follow from that."

50. Ward, L.J., although making some comments of his own, principally about the overriding objective in the English CPR, expressly agreed with the judgment of Chadwick, L.J., as did Roche, L.J.

51. The *Douglas* v. *Hello!* (5) application was heard by Morritt, V.-C. The plaintiffs applied for an order that the defences of the Hello! defendants should be struck out and judgment entered against them for damages to be assessed pursuant to the relevant rule of the CPR (r.3.4(2)) or the inherent jurisdiction of the court. The grounds for the application were that the Hello! defendants ([2003] E.M.L.R. 29, at para. 7)—

"1. made or caused to be made false statements to the Court of Appeal in November 2000 knowingly or without an honest belief in their truth,

2. deliberately destroyed or disposed of documents, and

3. made false disclosure statements knowingly, or without an honest belief in their truth and have thereby interfered with the course of justice by so doing and/or have thereby put the fairness of the trial in jeopardy, and rendered any judgment that may be entered in their favour unsafe and further proceedings unsatisfactory and prevented the Court from doing justice."

52. It should be noted that the hearing of the application took place prior to the trial of the merits of the action and also that there was cross-examination of four witnesses in the course of the hearing. The plaintiffs' substantive claim was for damages for breach of confidentiality and privacy arising out of the proposed unauthorized publication of photographs of their wedding. With regard to the question of alleged destruction of documents by and the failure of the *Hello!* defendants to give proper disclosure, the Vice-Chancellor said (*ibid.*, at paras. 35–43):

"35. That is by no means the end of the story relevant to the application before me. I also have to consider the subsequent events both with regard to the destruction of documents and the failure of the Hello! defendants to give proper disclosure. Neither is denied but the Hello! defendants seek to minimise the importance of what occurred. No criticism is made of Charles Russell, the solicitors acting then or now for the Hello! defendants or any of them. Accordingly I assume that they complied with their professional responsibility, as pointed out by Sir Robert Megarry, V.-C. in *Rockwell Machine Tool Co. Ltd.* v. *Barrus* [1968] 2 All E.R. 97, 98—

'to ensure that their clients appreciate at an early stage of the litigation, promptly after writ issued, not only the duty of discovery and its width but also the importance of not destroying documents which might by any possibility have to be disclosed. This burden extends, in my judgment, to taking steps to ensure that in any corporate organisation knowledge of this burden is passed on to any who may be affected by it.'

There can be no doubt that that statement applies to electronic messages in the same way as it applies to hard copies, CPR r.31.4.

36. The basis of the claimants' complaint, which is admitted, is that the Hello! defendants failed to preserve any document in electronic form and destroyed or failed to preserve all or most of the documents, original or copy, passing between them and the Marquesa. Such documents have been disclosed by the Marquesa in so far as she has them or copies of them. What is not available are the versions formerly in the possession of the Hello! defendants or any version of a document not disclosed by the Marquesa.

39. . . . The originals of these documents were destroyed by Hello! and Hola! Thus any information contained in the originals, such as any notes of the recipients have been irretrievably lost.

. . .

43. . . The Hello! defendants gave formal disclosure of documents on four occasions . . . It is not in dispute that this and each subsequent disclosure was defective in the respects relied on by the claimants in schedule C to their application form. The defective disclosure stems from the failure of the Hello! defendants to retain the documents to which I have referred and the deletion of emails from all their computers. Save in relation to emails sent or received before November 21st, 2000, there is no evidence that such destruction or disposal of a document took place before the proceedings had been commenced."

53. Having considered various other issues before him the Vice-Chancellor then considered the allegations relating to the destruction or disposal of relevant documents and said (*ibid.*, at paras. 86–99):

"86. Part B of the schedule to the application contains the details with regard to the allegations concerning the destruction or disposal of documents. As I have already recorded in para. [36] above the details are not in dispute. There is, however a distinction to be drawn between those which were destroyed or disposed of before these proceedings were commenced and those which were destroyed or disposed of thereafter. With regard to the former category it is established in the very recent decision of the Court of Appeal for the State of Victoria in *British American Tobacco Australia Services Ltd.* v. *Cowell* [2002] V.S.C.A. 197, paras. [173] and [175] that the criterion for the Court's intervention of the type sought on this application is whether that destruction or disposal amounts to an attempt to pervert the course of justice. There being no English authority on this point I propose to apply that principle, not only because the decision of the Court of Appeal for the State of Victoria is persuasive authority but because I respectfully consider it to be right.

87. The documents, which fall into this category, are the emails passing between the personnel in the Hello! defendants' offices and others. The solicitor for the Hello! defendants has stated that 'as with many other email systems, emails are deleted once read.' Plainly the deletion of such documents cannot justify the court's intervention. Nor in so far as any other type of document is concerned is there any evidence to suggest that pre-action documents were destroyed in an attempt to pervert the course of justice.

88. Thus the material disposals or destructions are those made after the effective commencement of proceedings on November 20th, 2000. These comprise.. Such destruction was plainly deliberate in the sense that it is not suggested to have been accidental. But was it more than that?

. . .

90. The issues are whether the rules have been transgressed, if so whether a fair trial is achievable and if not what to do about it. See [the *Logicrose* case (8) and the *Arrow Nominees* case (1) and the reference to the judgment of Chadwick, L.J. to which I have already referred above].

. . .

93. The destruction or disposal of the documents cannot have been due to muddle or misunderstanding. If the solicitors had properly discharged their responsibilities as specified in para. [35] above, which I have assumed, then such destruction or disposal was blameworthy. If they did not discharge such responsibility then the individuals, such as Mrs. Doughty, may not be blameworthy but that does not mean that the Hello! defendants can escape the consequences. The failure to give proper disclosure is a breach of the obligations of the Hello! defendants for which they are responsible even if the fault lay elsewhere.

. . .

96. The question remains whether by their conduct, in the words of the application, the Hello! defendants:

'have thereby interfered with the course of justice by so doing and/or have thereby put the fairness of the trial in jeopardy, and rendered any judgment that may be entered in their favour unsafe and further proceedings unsatisfactory and prevented the Court from doing justice.'

97. . . . [T]he documents known to have been disposed of or destroyed, except (but subject to inspection of whatever Mr. Ramey has disclosed) the photographs in digital format, have now been supplied by the other party to the communication. What is not available are the originals or copies of the documents destroyed which had been in the possession of the Hello! defendants. Such documents may or may not have had notes on them made by the recipient or sender respectively. Equally, there is not now available any other document destroyed or disposed of. But what evidence is there that there were any?

98. This is the conundrum. I have given anxious consideration to whether I should, on a balance of probability, infer from the conduct of the Hello! defendants to which I have referred that there were further material undisclosed documents. I consider that I should. Such documents would have been created on and after November 20, 2000 containing communications with others as part of the attempt to get the injunction discharged or concealing the falsity of the statements of Sr. Sanchez-Junco, the Marquesa or Mrs. Cartwright.

99 But does that inference justify striking out the whole or any part of the defence of the Hello! defendants? As stated by Millett, J. in . . . [the *Logicrose* case (8)]:

'I do not think that it would be right to drive a litigant from the judgment seat without a determination of the issues as a punishment for his conduct, however deplorable, unless there was a real risk that that conduct would render the further conduct of proceedings unsatisfactory. The court must always guard itself against the temptation of allowing its indignation to lead to a miscarriage of justice.'

   There can be no question, for example, of excusing the claimants from proof of other parts of their case by striking out the whole of the defence of the Hello! defendants."

54. Having considered specific paragraphs of the claim and also referred to the ability of the [trial] judge to draw inferences, the Vice-Chancellor said (*ibid.*, at para. 104):

"Accordingly, notwithstanding conduct attributable to the Hello! defendants which leaves a very great deal to be desired with regard to the veracity of their evidence and the adequacy of their disclosure I am not persuaded that a fair trial is no longer possible or that the deficiencies in the conduct of the defence of the Hello! defendants justifies an order striking out the whole or any part of it."

55. And accordingly the Vice-Chancellor *inter alia* made no order on the application of the claimants for an order striking out the defences of the Hello! defendants.

56. I will seek to draw conclusions on the various principles to be derived from these authorities, but before doing so I consider it appropriate that I should also refer to the well known passage on the nature of discovery in *Compagnie Fin. et Comm. du Pacifique* v. *Peruvian Guano Co.* (4) ("the *Peruvian Guano* case") which was cited to me. In that case, Baggallay, L.J. said (11 Q.B.D. at 59–60):

"I assent to the suggestion made by Brett, L.J., in the course of the argument, that a document, which, it is not unreasonable to suppose,

may tend either to advance the case of the party seeking discovery, or to damage the case of his adversary, should be regarded as a document relating to a matter in question in the action."

57. And Brett, L.J. said (*ibid.*, at 62–63):

"The party swearing the affidavit is bound to set out all documents in his possession or under his control relating to any matters in question in the action. Then comes this difficulty: What is the meaning of that definition? What are the documents which are documents relating to any matter in question in the action? In *Jones* v. *Monte Video Gas Co.* [5 Q.B.D. 556] the Court stated its desire to make the rule as to the affidavit of documents as elastic as was possible. And I think that that is the view of the Court both as to the sources from which the information can be derived, and as to the nature of the documents. We desire to make the rule as large as we can with due regard to propriety; and therefore I desire to give as large an interpretation as I can to the words of the rule, 'a document relating to any matter in question in the action.'

The doctrine seems to me to go farther than that and to go as far as the principle which I am about to lay down. It seems to me that every document relates to the matters in question in the action, which not only would be evidence upon any issue, but also which, it is reasonable to suppose, contains information which *may*—not which *must*—either directly or indirectly enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary. I have put in the words 'either directly or indirectly,' because, as it seems to me, a document can properly be said to contain information which may enable the party requiring the affidavit either to advance his own case or to damage the case of his adversary, if it is a document which may fairly lead him to a train of inquiry, which may have either of these two consequences . . ."

58. Clearly, none of the judgments from which I have recited extracts above was based on factual circumstances which are the same as those in the present case (although perhaps the circumstances in the *Douglas* v. *Hello!* case (5) are closest to the present situation), and a judge's exercise of discretion in determining whether or not to strike out a party's claim or defence will, of course, inevitably depend upon the particular circumstances. However, it has been clearly accepted in this jurisdiction, following the English authorities, that, first, in circumstances where a party has failed to meet its discovery obligations, it is not the function of the court to punish the party in default by striking out that party's claim or defence, but that the issue for the court is whether the consequence of such default is that there is a real or substantial risk that a fair trial of the action is no longer possible. The issue is whether the defaulting party's conduct has

put the fairness of the trial in jeopardy, such that there is a serious risk that any judgment in favour of that party would have to be considered unsafe. As Millett, J. said, as approved by the Vice-Chancellor, the court does not strike out the claim or defence because it disapproves of the party's conduct, but because the court is satisfied that the party's conduct has resulted in a substantial risk to the fairness of a trial. It is also clear that the proportionality of the sanction of striking out in the particular circumstances must be taken into consideration, and that it is not right to drive a litigant from the judgment seat as a punishment for his conduct, however deplorable, unless there is a consequent real risk that further conduct of the proceedings would be unsatisfactory and the fairness of a trial seriously questionable. Furthermore, in considering the destruction of relevant documents, a distinction is to be drawn between such destruction prior to the commencement of the relevant proceedings and such destruction after the commencement of the relevant proceedings. As far as destruction prior to the commencement of the relevant proceedings is concerned, the justification for the involvement of the court is whether such destruction amounted to an attempt to pervert the course of justice. Lastly, the question whether or not there should be cross-examination on the affidavits filed in such a strike-out application is, in practice, a question of case management and will depend on the precise circumstances.

59. It seems to me that, in light of these general principles that, at the end of the day, the principal questions which I must answer in this particular case are whether the Renova parties have failed to comply with their discovery obligations, and, if so, whether the consequence of that is that there is a substantial risk that a fair trial of the merits of the case is not possible. That is, of course, a considerable generalization of the issues arising, but is nonetheless ultimately what, in my view, requires to be determined.

**Comments and conclusions**

60. Having heard the submissions of leading counsel for the parties, and having read again the affidavit evidence submitted by or on behalf of the Renova parties in opposition to the application, my initial view expressed in my *ex tempore* ruling of November 30th that it seemed to me that there was an obvious lack of discovery by the Renova parties has not substantially changed. In my view, their own evidence shows there has been a serious disregard by the Renova parties of their need to preserve documents arising from their obligation to give discovery in these proceedings. This is exemplified by the fact that Mr. Mamaev, a member of the Renova Group I.T. staff, who reported directly to Mr. Grosset, the Head of the Renova Group I.T. department, and who regularly travelled from Moscow to Zurich to deal with I.T. matters there, was not made aware, until some

time in the second week of December 2010, even of the existence of these proceedings, and even then he was given no details of the November 30th order or its implications. If he had no knowledge until then of these proceedings, it is reasonable to assume he had no knowledge of the need to ensure or even apply his mind to the preservation of data potentially relevant to the issues in dispute in these proceedings, at least from May 2008. My overall impression of the evidence filed by the Renova parties in response to the Gilbertson parties' strike-out application is that, notwithstanding the legal advice concerning discovery given to them in January 2007 and again in October 2009 (which itself seems to me to have been surprisingly late in the day), there was a complete disregard by the Renova group of the need to preserve all relevant documents, including the potential sources of such documents for discovery purposes. The Zurich server crash shortly before these proceedings were commenced was obviously unfortunate. However, the steps taken thereafter to destroy, over time, all the possible alternative sources of e-mail or other electronic data, some of which may well have been relevant to these proceedings, to my mind amounts to a complete lack of consideration for, and disregard of, the need to preserve all potential sources of relevant documents. It is no answer for the Renova parties to say that the proposed investment in the rights was but a very small part of the Renova Group's business nor, in my view, is it good enough simply to say that the Renova Group's own I.T. department were themselves unable to access data from these alternative sources as a justification for their destruction in light of their discovery obligations. The evidence of the I.T. experts is that if such alternative sources had not been destroyed, it probably would have been possible to reconstitute and access data from those sources, yet the Renova Group did not consult any such expert until effectively compelled to do so by the indications given by the court at the hearing which led to the *ex tempore* ruling and the November 30th order.

61. As I have already summarized, it was argued strenuously on behalf of the Renova Group that no obligation to preserve documents which are relevant or potentially relevant to the proceedings arises until an order for discovery is made. I do not accept that submission, and in my view it is not supported by the authorities which were cited to me. The crucial distinction is the position prior to the commencement of proceedings and the position after the proceedings have commenced. The approach adopted in England (see the *Douglas* v. *Hello!* case (5) adopting the approach of the Australian *British America Tobacco Australia Servs. Ltd.* v. *Cowell* (2)) is that the relevant question in the case of destruction or disposal of documents before proceedings are commenced is whether that amounted to an attempt to pervert the course of justice. However, the issue for the court's determination in respect of destruction or disposal of relevant documents after proceedings have commenced is whether such

destruction or disposal has caused a substantial risk that a fair trial is no longer possible.

62. There is no evidence in this case, and leading counsel for the Gilbertson parties did not submit, that the steps taken by the Renova Group in destroying all the potential sources of relevant documents, although clearly deliberate, amounted to an attempt to pervert the course of justice. Accordingly, on the authority of the *British American Tobacco* case, which I can also see no good reason for not accepting as representing the law of the Cayman Islands, it would appear that any destruction of documents prior to the commencement of these proceedings in May 2008 would not itself justify the courts' intervention of the nature applied for by the Gilbertson parties. However, I consider that it can legitimately be said that the issue in this case is rather broader than that because, first, the Renova parties, through their Chief Legal Officer and their Deputy Chief Legal Officer, were advised in January 2007, when these proceedings were clearly in contemplation, of the need to preserve relevant documents, and, secondly, because the deliberate destruction of all the potential sources of relevant documents by the Renova parties, which took place subsequent to the computer crash and subsequent, or substantially subsequent, to the commencement of these proceedings, was carried out in the light of the legal advice given in January 2007. I have, therefore, concluded that this is a case in which the deliberate destruction of all potential sources of relevant documents, established on the affidavit evidence of the Renova parties, is *prima facie* blameworthy and culpable. However, before turning to whether or not the consequence of that is to create a serious risk that a fair trial is not possible, I should first deal with several of the other issues which were the subject of argument, as I have already generally summarized.

63. The Gilbertson parties' strike-out application is grounded first on GCR, O.24, r.20 and, in the alternative, on the inherent jurisdiction of the court. It was argued on behalf of the Renova parties that GCR, O.24, r.20 is not applicable in the circumstances of this case because, it was contended, the court has not made an order for discovery against the Renova parties with which they have failed to comply. They also argue that the court has no inherent jurisdiction because GCR, O.24, r.20 codifies the circumstances in which the court may strike out a party's action on the ground of that party's failure to comply with its discovery obligations and limits such obligations to compliance with a court order for discovery. In this regard some reliance was placed upon the fact that GCR, O.24, r.20 is slightly narrower in ambit than the equivalent Supreme Court Rule in England (RSC, O.24, r.16), which refers to failure to comply with any requirement of the rules as well as of any order made thereunder, whereas GCR, O.24, r.20 only refers to failure to comply with an order for discovery, and does not refer to non-compliance with the

Rules. Leading counsel for the Renova parties contended that para. (iii) of the November 30th order, requiring preservation of documents and of all relevant I.T. equipment, was not an order for discovery in the sense referred to in GCR, O.24, r.20 even if, which was not admitted, there was a breach of that paragraph of the order by virtue of the destruction of the logical drive of the failed Zurich server as referred to above subsequent to the order.

64. I would be very loath to accept that, in circumstances such as these, the court was powerless to regulate its own process in respect of discovery, in order to be able to ensure a fair trial and justice generally, if not inconsistent and in keeping with the Rules. In my view, the provisions of GCR, O.24, r.20 are capable of being interpreted widely enough to include an order for the preservation of documents and of the I.T. sources of documents so as to enable proper discovery. Such a preservation order is clearly not an order made pursuant to or governed by GCR, O.29, which relates to the preservation of the subject-matter of a cause or matter. The documents, or potential documents, in issue here are documents which are or may be discoverable as relevant to the issues in the case. They are not the subject-matter of the proceedings as the documents were, for example, in the *TMSF case (10)*. In my opinion, para. (iii) of the November 30th, order was clearly an ancillary part of the discovery process, and was properly made in light of the Renova Group's obligations arising at least since the commencement of the proceedings to preserve, and not to destroy potentially discoverable documents, or the sources thereof, as part of the requirements of their discovery. Clearly those obligations were recognized by the Renova Group's own Cayman attorneys and London solicitors, in advising them of the need to preserve relevant documents in January 2007, and again in October 2009. In light of the terms of the original July 20th order and of the November 30th order, I consider that the Gilbertson parties' application may be considered to fall within the terms of GCR, O.24, r.20. Furthermore, and in the alternative, I am anyway of the opinion, as I have already suggested, that this court does have an inherent jurisdiction to ensure fair and proper practice as between the parties as far as discovery is concerned, with a view to achieving a fair trial and a just outcome to the disputes between them. Discovery is a fundamental part of our trial process and, as I said in the *ex tempore* ruling, it is essential in order for justice to be done and seen to be done by a fair and just trial of the issues.

65. The test for relevance to the issues is extremely broad (see the *Peruvian Guano* case (4)). I have also already said on previous occasions in these proceedings that I consider that this is a case which, if the parties cannot resolve their differences by some other means, should go to trial and the parties' respective claims determined after full discovery and oral evidence with cross-examination in the usual way (see my third ruling

dated May 5th, 2010). An inherent jurisdiction in the court to control its own process in this respect, and to prevent the destruction of documents or the likely sources of documents, which are or may be relevant to the issues, does not, in my view, in such circumstances, contravene the principle established by the Court of Appeal in *HSH Cayman I GP Ltd. v. ABN AMRO Bank N.V. (6)*. An inherent jurisdiction of the court to intervene in circumstances where there is, *prima facie*, a culpable failure to observe the fundamentals of proper discovery, quite apart from the provisions of GCR, O.24, r.20, is not inconsistent with that or the other relevant rules. Indeed, the unchallenged order made at para. (iii) of the November 30th order, for the preservation of potentially relevant documents and the I.T. equipment on which potential relevant data is likely to be stored, is itself, it seems to me, an exercise of such inherent jurisdiction. In this regard, I note also that in the *Douglas* v. *Hello!* case (5) the learned Vice-Chancellor stated, without any adverse comment, that the strike-out application in that case was also founded, in the alternative, upon the inherent jurisdiction of the court. I do not accept the submissions made on behalf of the Renova parties to the effect that this court does not have jurisdiction in the circumstances of this case to strike out the plaintiff's claim and the defence to the counterclaim should it consider it appropriate, in the interests of justice and in the exercise of its discretion, to do so.

66. Leading counsel for the Renova parties also submitted that a party should not be permitted to go behind the other party's discovery affidavit. Although no application was made by the Gilbertson parties for cross-examination of the Renova parties' deponents on their affidavits, leading counsel for the Renova parties argued also that no such cross-examination should anyway be permitted, at least at an interlocutory stage such as this. It was contended on behalf of the Gilbertson parties that, although they did not consider it necessary, it was open to the court to order such cross-examination if the court felt unable or unwilling to determine their strike-out application on the basis of affidavit evidence without cross-examination. I accept that in appropriate circumstances the court could direct cross-examination if it considered it necessary and appropriate, although I also accept that such a requirement would, on an interlocutory application such as this, be very unusual. In light of the final conclusion which I have reached, as explained below, I have not thought it necessary to consider the question of cross-examination any further.

67. As far as the question of going behind a discovery affidavit is concerned, reference was made to the judgment of Stuart-Smith, L.J. in the English case of *Lonrho Plc* v. *Fayed (No. 3)* (9). However, in the present case, the Renova parties have not only filed affidavits verifying their further and better lists of documents pursuant to the November 30th order (or, in the case of the individual Renova parties, the April 7th order),

but they have filed a significant number of affidavits, not only by the individual Renova parties themselves but also by other relevant individuals within the Renova Group, such as Mr. Cheremikin, Mr. Kalberer, Mr. Grosset, and Mr. Mamaev, as well as reports by their independent I.T. experts, directly in response to the Gilbertson parties' strike-out application. In my view, whatever the principle may be in relation to going behind an affidavit filed solely for the purpose of verifying a list of documents, there is no such principle in relation to affidavits of the nature and for the purpose submitted by the Renova parties in opposition to the present strike-out application.

68. Even if I am justified in my conclusion, on the basis of the affidavit evidence submitted by or on behalf of the Renova parties, that there was deliberate destruction of potential sources of relevant e-mails, and that *prima facie* such destruction was in the circumstances blameworthy, it is well established that any consequent intervention by the court should not be in the nature of punishment of the offending party. The issue for determination by the court in such circumstances is whether as a consequence of the offending party's culpable failure to comply with his discovery obligations there is a substantial risk that a fair trial is no longer possible. As Morritt, V.-C. reiterated in the *Douglas* v. *Hello!* case (5), citing Millett, J. in the *Logicrose* case (8) ([2003] E.M.L.R. 29, at para. 99): "The court must always guard itself against the temptation of allowing its indignation to lead to a miscarriage of justice."

69. Millett, J. said earlier in the *Logicrose* case (8), in a passage adopted as correct by the Court of Appeal in *Arrow Nominees Inc.* (1), that a litigant is not to be deprived of his right to a fair trial because of failures in his discovery obligations— even where that was deliberate and amounted to a contempt of court—unless his conduct rendered (or there is a real risk that it rendered) a fair trial impossible.

70. As I have already indicated, this is not a case like the *TMSF case (10)*, where the potential documents lacking from the Renova Group's discovery, of which any possible recovery has been destroyed by them, are fundamental to the resolution of the issues in dispute. In the present case, any such documents, if they had been recovered and discovered, would no doubt have been a helpful source of cross-examination of the Renova parties' witnesses, but they would not have been fundamental to the resolution of the parties' respective cases. The parties, of course, as I have said, dispute the extent to which the whole history of relations between them, as put forward by the Gilbertson parties, is necessary for and relevant to the court's final determination of the essential issues in the case in any event. However, even if the Gilbertson parties' more extensive approach to the issue to be determined is adopted, I find it difficult to see how internal communications between the Renova parties themselves and between them and other individuals in the Renova Group could be

determinative of those issues. It seems to me that the resolution of most, if not all, of the issues in dispute will largely turn upon the consequences of largely undisputed factual actions and the legal analysis of those actions. There is little, if any, dispute about what actually happened and what the parties did or did not do, in respect of which it seems that the relevant *inter partes* correspondence and other relevant documents are all available. What the parties said internally as between themselves is, in this case, in my judgment, of secondary importance and in some instances not relevant or possibly not even admissible anyway.

71. It should not be overlooked in this context that a trial of these proceedings will involve witness statements, oral evidence, and cross-examination in respect of which the court may draw such inferences as it considers the whole evidence and the circumstances justify in reaching its final conclusions. The absence of discoverable documentation may possibly make cross-examination of the Renova parties' witnesses more difficult for the Gilbertson parties, but I am not satisfied that it would prejudice them to the extent that a fair trial would not be possible or that there would be a substantial risk that a fair trial would not be possible. It was submitted on behalf of the Renova parties that there is no evidence that there was, in fact, any relevant e-mail or other data on the crashed Zurich sever (and *a fortiori*, on the encrypted and unencrypted back-up tapes, the decommissioned Moscow server or the deleted logical drive). Having regard to what, in my view, are the more likely probabilities in the overall circumstances, namely that, on a balance of probabilities, there would have been relevant e-mails on the Zurich server, it does seem to me nevertheless equally improbable that any such e-mail data, even if it were made available, would be determinative of the issues between the parties or that the absence thereof would lead to a miscarriage of justice.

72. To strike out a party's action or defence at an interlocutory stage is clearly a very strong step. It obviously deprives the party concerned of the opportunity to present and argue his claim or defence on the merits for what are, after all, procedural reasons. That should only be done, in my view, where the risk of injustice to the other party in proceeding with the trial without such discovery is serious and substantial and clearly outweighs the obvious injustice to the defaulting party concerned in having his claim or defence struck out without consideration of its merits. Such a significant and prejudicial step must clearly also be proportional to the seriousness of the default of the offending party and the seriousness of its consequences. Although in this case the Renova parties do not dispute that they deliberately destroyed all potential sources of internal communications and other records (although they seek to justify that) and I consider, at least on a *prima facie* basis, such actions to have been blameworthy and culpable, there is no application for a finding of contempt of court or of abuse of process. Notwithstanding my serious concerns about the Renova

parties' conduct with regard to discovery, and, in particular, their destruction of all potential sources of discoverable documentation, I am not persuaded that a fair trial of these proceedings is no longer possible or that there is a substantial risk that that is so. Accordingly, I do not consider on balance that this is a case which warrants the striking out of the plaintiff's action or the Renova parties' defence to the counterclaim. I therefore refuse the Gilbertson parties' application.

**Costs**

73. Although I have refused the Gilbertson parties' application, it seems to me that the inappropriate conduct of the Renova parties is responsible for the legitimate concerns, which I share, about their discovery. Accordingly, in the somewhat unusual circumstances here, I would, subject to my comment below, order that the costs of and incidental to this application should be costs in the cause. However, I am conscious that I have not heard any argument on costs and therefore, if counsel for the parties do not accept that this is an appropriate order in the circumstances, I will hear submissions on costs at a later date.

*Application dismissed.*

*Appleby* for the applicants; *Maples and Calder* for the respondents.