**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

---

In re Application of

Oasis Focus Fund LP and Quadre Investments, L.P.

Petitioners, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding.

Case No. 22-

---

# DECLARATION OF ROCCO CECERE IN SUPPORT OF THE *EX PARTE* APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, Rocco Cecere, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney licensed to practice law in the Cayman Islands, and I am admitted to practice before the courts of the Cayman Islands. I am a partner in the law firm Collas Crill and head of the firm's "Section 238" merger appraisal team. I have been practicing as a litigation attorney for over twenty years. I have practiced in the Cayman Islands since 2013, and before this, practiced in Australia, Ireland, and the Channel Islands. I have significant offshore commercial litigation experience with substantial knowledge of Cayman Islands law governing corporate and cross border shareholder disputes before the Cayman Islands courts. In particular, I have been engaged in 17 merger appraisal cases, including cases put before this Court, and am ranked in both Chambers Global and Legal 500 for dispute resolution.

2. I represent 21 of the total 52 dissenting shareholders, including Petitioner Quadre Investments, L.P., in an appraisal proceeding (the "**Appraisal Proceeding**") filed in the Grand Court of the Cayman Islands (the "**Grand Court**") to determine the fair value of their former shareholdings in 51job, Inc. ("**51job**" or the "**Company**"). Oasis Focus Fund LP is represented

by Campbells, another Cayman Islands law firm, but I am authorized to give this declaration on its behalf for the purpose of this Application. This Application is supported by an additional 24 dissenting shareholders (or a total of 26 of the 52 total dissenting shareholders who collectively hold 69.05% of the total number of shares subject to the Appraisal Proceeding).

3. I attach hereto true and correct copies of the following documents that I refer to in this declaration: the proxy statement filed by the Company on March 29, 2022 in connection with the Amended Merger ("**Proxy Statement**") as **Exhibit 1**; the Schedule 13e-3 Transaction Statement filed by the Company on July 6, 2021, as **Exhibit 2**; a press release issued by the Company on November 8, 2021, as **Exhibit 3**; the petitions filed by the dissenting shareholders I represent and the Company before the Grand Court commencing the Appraisal Proceeding as **Exhibits 4** and **5**; a press release issued by the Company on April 27, 2022, as **Exhibit 6**; a pdf of an article from SmartKarma titled *Event-Driven: Cross Harbour Holdings, 51 Job Inc Adr, CaixaBank SA and more*, dated September 19, 2020, as **Exhibit 7**; a press release from the Company dated March 1, 2022, as **Exhibit 8**; the Grand Court's judgment dated 2 December 2022 arising from the directions hearing in the Appraisal Proceeding held on November 21 and 22, 2022: *In the Matter of 51job, Inc.* (Unreported, 2 December 2022) as **Exhibit 9**; a letter from the Company to the dissenting shareholders dated August 12, 2022, as **Exhibit 10**; the first affidavit of Eric Gunawan ("**Gunawan 1**") filed in the Appraisal Proceeding on October 12, 2022, as **Exhibit 11**; the first affidavit of Malachi Kevin Sweetman filed in the Appraisal Proceeding on October 12, 2022 ("**Sweetman 1**") as **Exhibit 12**; and a letter from certain dissenting shareholders to the Company dated December 9, 2022 as **Exhibit 13**.

4. I submit this declaration in support of the Petitioners' application seeking an order pursuant to 28 U.S.C. § 1782 ("**Section 1782**") to obtain discovery from Kroll, LLC (f/k/a Duff &

Phelps, LLC) ("**Duff & Phelps**") and Kroll Securities, LLC (f/k/a Duff & Phelps Securities, LLC) ("**DPS**" and together with Duff & Phelps, "**Respondents**") relating to the fair value of the dissenting shareholders' former shares in the Company and the rationale for the Amended Merger (as defined below) for use in the Appraisal Proceeding (the "**Application**").

5. To the extent the contents of my declaration are within my personal knowledge, they are true and accurate. To the extent that the contents of my declaration are not within my personal knowledge, they are true to the best of my current knowledge, information, and belief.

### I. The Petitioners and Relevant Background to the Appraisal Proceeding.

6. The Petitioners, along with the other dissenting shareholders, were shareholders of the Company prior to the Company completing its going-private merger on May 6, 2022 (the "**Amended Merger**"). The Petitioners are parties to the Appraisal Proceeding and have complied with the statutory requirements under Section 238 ("**Section 238**") of the Cayman Islands Companies Act (2022 Revision) (the "**Act**")—a statutory provision that allows shareholders to dissent from a merger and demand payment of the fair value of their shares, which is to be determined by the Grand Court. In total, minority shareholders holding in excess of US$1.6 billion worth of shares in the Company based on the Original Merger Price (as defined below) and representing at the time of the Amended Merger approximately 31% of the total outstanding shares of the Company, and approximately 73% of all shares not owned by the Continuing Shareholders (as defined below), objected to and dissented from the Amended Merger on the basis that the Revised Merger Price of US$61.00 is not fair value.[1]

---

[1] The Proxy Statement explains that "[a]s of the date of the Proxy Statement, the Continuing Shareholders and their affiliates collectively beneficially own an aggregate of 38,998,772 common shares," (Proxy Statement at ii), and that "[a]t the close of business in the Cayman Islands on April 14, 2022, the Share Record Date for the extraordinary general meeting, 67,487,259 Shares are expected to be issued and outstanding and entitled to vote at the extraordinary general meeting." (*Id.* at 22.) Therefore, the dissenting shareholders held 20,770,485, or approximately

3

7. The Company was founded in 1998, and is and was at all material times incorporated as an exempted limited company under the laws of the Cayman Islands. The Company is headquartered in Shanghai, People's Republic of China ("**PRC**"). (**Exhibit 1**, Proxy Statement at 4.) The Company is a leading provider of integrated human resources services with its primary business lines operating in the PRC. (*Id.*) From 2004 until completion of the Amended Merger on May 6, 2022, the Company's shares were listed (through American Depository Receipts) on the NASDAQ Global Select Market under the symbol "JOBS." (*Id.* at ii; 9.) The dissenting shareholders purchased shares in the Company while it was trading on the NASDAQ Global Select Market.

8. At all material times prior to the Amended Merger, Recruit Holdings, Ltd. ("**Recruit**"), a human resources company incorporated and headquartered in Japan, was the largest shareholder of the Company; Rick Yan (a co-founder of the Company) was a director and the chief executive officer and president of the Company; and Kathleen Chien (another co-founder of the Company) was the chief operating officer and acting chief financial officer of the Company. (*Id.* at 5, 28.)

**II. The Amended Merger.**

9. On January 16, 2020, precisely two weeks before the World Health Organisation declared COVID-19 a 'Public Health Emergency of International Concern' on January 30, 2020, the Company's share price traded as high as US$91.75. By September 14, 2020, in the midst of

---

31% of outstanding shares (20,770,485 / 67,487,259). Further, the calculation as to the dissenting shareholders representing 73% of non-Buyer Consortium shares is arrived at by subtracting 38,998,772 from 67,487,259, which equals 28,488,487, and then dividing 20,770,485 by 28,488,487.

the global COVID-19 pandemic, the price of the Company's shares had dropped by approximately 28%, and was trading as low as US$66.00.[2]

10. It appears from the Proxy Statement that at this time, the Company, acting by its full board, including Mr. Yan and Recruit nominated-director Mr. Junichi Arai, engaged Rocketeer Management ("**RM**") "as a strategic consultant to explore potential strategic transactions, including possible minority or control transactions, mergers and acquisitions, debt financings or equity financings." (**Exhibit 1**, Proxy Statement at 28.) RM then approached private equity funds DCP Capital Partners II, L.P. and Oriental Poppy Limited (collectively, "**DCP**") to explore possible financing or strategic transactions involving the Company. (*Id.* at i, 28.) In a subsequent phone call, DCP indicated that it would likely extend to Mr. Yan, other members of the Company's management team, and Recruit, an invitation to roll over all or a portion of their existing equity in the Company. (*Id.*) On September 17, 2020, DCP delivered a preliminary, non-binding proposal letter to the Company, offering to acquire all outstanding shares of the Company, including shares represented by American Depositary Shares ("**ADS**"), for US$79.05 per share or per ADS. (*Id.*) This offer was described by some market commentators as "opportunistic" in light of how the COVID-19 pandemic affected the Company's share price. (**Exhibit 7** at 3.)

11. The following day, September 18, 2022, representatives of another group of private equity funds and affiliated persons (consisting of Mr. Nanyan Zheng, Mr. Tianyi Jiang, Alliance Ascend GP Limited, Alliance Ascend L.P., Ocean Link Partners II GP Limited, Ocean Link Partners II GP, L.P., Ocean Link Partners II, L.P., Ocean Ascend Holding Limited, and Ocean Ascend Limited (collectively, "**Ocean Link**")), contacted the management of the Company to express interest in participating in the proposed transaction. (*Id.* at i-ii, 28.) On September 21,

---

[2] https://www.investing.com/equities/51job-historical-data.

5

2020, the Company announced the formation of a special committee, comprised of Li-Lan Cheng and Eric He, two independent directors (the "**Special Committee**"). (*Id.* at 29.) The Special Committee was tasked with evaluating and considering the proposed transaction or any alternative strategic options that the Company may have pursued. The Special Committee engaged the Respondents as its financial advisors on September 30, 2020. (*Id.*)

12. In early May 2021, DCP, Ocean Link, Yan, and entities affiliated with Yan formed the buyer consortium with the consent of the Special Committee (which was required under the terms of the various confidentiality agreements entered into by these parties) (the "**Buyer Consortium**").[3] (*Id.* at 33.) On May 4, 2021, the Buyer Consortium delivered an updated non-binding going-private proposal letter, pursuant to which the Buyer Consortium proposed to, together with their respective affiliates, acquire all of the Company's outstanding shares and ADS for US$79.05 in cash per share or per ADS. (*Id.* at *i-ii*, 33.). The letter stated that the Buyer Consortium had "agreed to work exclusively with each other in pursuing the Proposed Transaction." (*Id.* at 33.)

13. Further negotiations ensued between the Buyer Consortium and the Special Committee. On June 21, 2022, Duff & Phelps rendered an oral opinion, subsequently confirmed by a written opinion that same day addressed to the Special Committee, that the per share and per ADS original price of US$79.05 ("**Original Merger Price**") was fair (the "**Original Opinion**"). (*Id.* at 12, 36-37.) I note that as late as January 16, 2020, the Company's shares traded at US$91.75 and had traded at over US$113.[4] The Original Merger Price was therefore significantly lower than

---

[3] For completeness, the Buyer Consortium consists of Garnet Faith Limited, DCP, Ocean Link, Yan, RY Holdings Inc., RY Elevate Inc., and 51 Elevate Limited. (**Exhibit 1**, Proxy Statement at ii.)
[4] https://www.investing.com/equities/51job-historical-data.

6

the Company's pre-COVID trading price. Indeed, the Special Committee had requested an increase on the per share and per ADS price of US$79.05, as well as a 'majority of the minority' voting requirement as a closing condition. (*Id.* at 34-35). However, the Buyer Consortium "firmly rejected" any increase in price and also would not agree to a 'majority of the minority' closing condition. (*Id.*) The Special Committee ultimately "decided to forgo the "majority of the minority vote" voting requirement" and further negotiations on the price. (*Id.* at 35.)

14. Subsequently on June 21, 2021, the Board approved and the Company entered into an agreement and plan of merger (the "**Original Merger Agreement**") with Garnet Faith Limited, an exempted company incorporated under the laws of the Cayman Islands ("**Merger Sub**"). (*Id.* at i, 37.) The Company then filed a Schedule 13E-3 form and draft proxy statement with the Securities and Exchange Commission on July 6, 2021. (**Exhibit 2**).

15. After entering into the Original Merger Agreement, there does not appear to have been any public communication from the Company regarding the deal's progress for four months. On November 8, 2021, the Company issued a press release stating that "certain members of the buyer consortium" had "been in consultation with Chinese regulators on recent regulatory changes in China that may be applicable to the Company and the [Original Merger Agreement]." (**Exhibit 3**.) The Company explains in the Proxy Statement that, in early August 2021, DCP and Ocean Link raised with Mr. Yan and the Company certain "recent regulatory changes" in the PRC "and their potential impact on" the Original Merger Agreement. (**Exhibit 1**, Proxy Statement at 38.) However, save for non-specific references in the Proxy Statement to regulatory changes "surrounding national security, cybersecurity, and data security" and "informal consultations with Chinese regulators," the Proxy Statement does not appear to otherwise describe the specific PRC regulatory changes concerned or the way in which those regulatory changes are said to have

impacted the viability of the Original Merger Agreement. (*Id.*) There is accordingly a question as to why the Buyer Consortium initiated contact with PRC regulators in circumstances where that contact ultimately lead to the renegotiation of the Original Merger Agreement on terms that were more beneficial to the Buyer Consortium and at the expense of the minority unaffiliated shareholders.

16. On January 12, 2022, the Buyer Consortium submitted to the Special Committee a proposal letter that changed the terms of the Original Merger Agreement. The Buyer Consortium's new proposal offered US$57.25 per share. (**Exhibit 1**, Proxy Statement at 38.) This represented a 28% decrease from the price of US$79.05 reflected in the Original Merger Agreement. On January 13, 2022, the Special Committee instructed Duff & Phelps to "conduct financial analysis" of the Company for the purpose of evaluating the Buyer Consortium's revised offer. On February 11, 2022, Duff & Phelps informed the Buyer Consortium that the new proposal "was insufficient and urged the Buyer Consortium to proceed with the transaction contemplated under the Original Merger Agreement or submit a substantially improved offer." (*Id.* at 39.) The Buyer Consortium however refused to increase its new proposal, which it maintained was "fair and reasonable" in light of prevailing market conditions. (*Id.* at 39.)

17. While the Proxy Statement suggests that the Special Committee took advice on "what possible actions the Company could take to proceed with the transactions under the Original Merger Agreement," and the possibility of "pursuing the transactions contemplated by and/or remedies available under the Original Merger Agreement," it seems that these options were not pursued by the Special Committee or the Company. (**Exhibit 1**, Proxy Statement at 38-39.) Instead, the Special Committee eventually agreed to "accept" a renegotiated price of US$61.00 per share or per ADS (the "**Revised Merger Price**"). (*Id.* at 40.) The offer of US$61.00

8

represented a 23% decrease from the price contained in the Original Merger Agreement, and was 34% lower than its pre-pandemic trading price of US$91.75. It also represented the bare amount necessary for Duff & Phelps to achieve its US$500,000 capped incentive fee.[5] The Buyer Consortium's offer of US$61.00 was also conditional on the Company agreeing to shorten the go-shop period to 15 days. (*Id.* at 40.)

18.     On March 1, 2022, the Company and Merger Sub entered into amendment No. 1 to the Original Merger Agreement (the "**Amended Merger Agreement**"). This contemplated that Merger Sub would be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "**Surviving Company**"). (*Id.* at i, 41.) The so-called Continuing Shareholders and their affiliates—being certain members of the Buyer Group (including Ms. Chien and Mr. Yan)[6] also entered into an amended support agreement dated March 1, 2022, pursuant to which each of the Continuing Shareholders agreed to vote in favor of the Amended Merger Agreement. As of March 29, 2022, the Continuing Shareholders beneficially held approximately 56.2% of the Company's total issued and outstanding shares. (*Id.* at ix.)

19.     Also on March 1, 2022, Duff & Phelps rendered its revised oral opinion, subsequently confirmed by a written opinion that same day addressed to the Special Committee, that the per share and per ADS Revised Merger Price of US$61.00 was fair (the "**Revised**

---

[5] The Revised Opinion provided that Duff & Phelps could earn (in addition to its normal fee) an incentive fee, being an "amount equal to 0.5% of the excess of the Per Share Merger Consideration over the US$57.25 price offered in the Revised Proposal, multiplied by the number of Shares cashed out in the Merger, capped at US$500,000." (**Exhibit 1**, Proxy Statement at 69.) The number of shares to be cashed out was 28,488,487 shares (equal to total shares outstanding as at the Record Date (67,487,259 shares) less shares owned by continuing shareholders (38,998,772 shares)). (*Id.* at 94-95.) Therefore Duff & Phelps incentive fee was capped if they achieved an increase of just $3.51/share ($500,000 divided by 0.5% divided by 28,488,487) from the $57.25/share re-offer price. That equates $61/share ($57.25/share + $3.51/share = $60.76/share). Therefore, Duff & Phelps only achieved an increase in the Revised Merger Price sufficient to get paid its maximum incentive fee.

[6] The Continuing Shareholders consist of Mr. Yan, Ms. Chien, LLW Holding Ltd., RY Holdings Inc., RY Elevate Inc., Recruit Holdings Co., Ltd. (**Exhibit 1**, Proxy Statement at ii.)

9

**Opinion**"). (*Id.* at 13.) I would note that the Revised Opinion "only addressed the fairness from a financial point of view" of the Revised Merger Price. (*Id.*) On that same day, the Special Committee, *inter alia*: (a) determined that the Amended Merger was fair and in the best interests of unaffiliated shareholders; (b) recommended that the Board approve and authorize the Amended Merger; (c) recommended that the Board submit the Amended Merger to the Company's shareholders for approval; and (d) recommended that unaffiliated shareholders vote in favor of the Amended Merger. (*Id.* at iii-iv.)

20. The Amended Merger Agreement included the shortened go-shop period, which ran from March 1, 2022 – March 16, 2022. (*Id.* at 14.) DPS provided services in connection with the go-shop exercise. (**Exhibit 1**. Proxy Statement at 62.) In addition, neither the Original Merger Agreement or the Amended Merger Agreement included a "majority-of-the-minority" condition.

21. An Extraordinary General Meeting of the Company's shareholders was held on April 27, 2022, to vote on the Amended Merger. (**Exhibit 6**.) As noted above, the so-called "Continuing Shareholders," together beneficially held 56.2% of the Company's issued and outstanding shares at the time of the Proxy Statement and had executed a support agreement to vote in favor of the Amended Merger. Because only 76% of the Company's total outstanding shares were voted at the meeting, the Continuing Shareholders—who as noted above were Company 'insiders' and therefore conflicted *vis-a-vis* the Amended Merger—had sufficient voting power to approve the Amended Merger at the Extraordinary General Meeting.[7] (*Id.*)

22. The Amended Merger was consummated on May 6, 2022. The Surviving Company, which operates under the name 51job, Inc., is a privately held company and its ADS

---

[7] I.e., 56.2/76 = 74%. Under Cayman Islands law, the merger could be approved by two thirds of shareholders present and voting at the Extraordinary General Meeting.

are no longer listed on the NASDAQ Global Select Market.[8] (**Exhibit 1**, Proxy Statement at ii.) The Company's March 1, 2022, press release stated that, among other things, the Amended Merger Agreement gave the Company an implied equity value of approximately US$4.3 billion. (**Exhibit 8**.) On the basis that the implied equity value from the original transaction was US$5.7 billion, the renegotiation of the Original Merger Agreement caused a total reduction in consideration in the region of US$1.4 billion. Conversely, the Amended Merger Agreement resulted in a significant windfall for Mr. Yan. Best estimates are that Mr. Yan, who ultimately acquired a 45.56% equity stake in the now privately held Company is likely to have benefitted up to hundreds of millions of dollars by successfully renegotiating the terms of the Original Merger Agreement. (**Exhibit 1**, Proxy Statement at 82.)

23. Duff & Phelps was engaged by the Special Committee to serve as its independent financial advisor and the Proxy Statement describes regular contact between Duff & Phelps and the Special Committee and its legal advisors, as well as between Duff & Phelps and the Company and its legal advisors. Duff & Phelps also communicated with the Buyer Consortium directly at the Special Committee's instruction. (*See, e.g., id.* at 30-40.) In addition, DPS was also engaged by the Special Committee as its independent financial advisor. (*Id.* at 12). DPS provided services in connection with the go-shop exercise, as well as "certain financial and market related advice and assistance as requested by the Special Committee." (**Exhibit 1**, Proxy Statement at 62, C-5.)

24. It is not clear on what basis the Original Merger Agreement could have been terminated by the Buyer Consortium. I am not aware of any Company filings which contend that a "Termination Event" or "Materially Adverse Effect" had occurred pursuant to the Original

---

[8] Specifically, the Surviving Company is beneficially owned by: DCP Fund; Oriental Poppy Limited; Ocean Link; Yan; RY Holdings Inc.; RY Elevate Inc.; 51 Elevate Limited; Recruit Holdings Co., Ltd; Chien; and LLW Holding Ltd. (**Exhibit 1**, Proxy Statement at i-ii.)

11

Merger Agreement. Nor am I aware (from the Proxy Statement or otherwise) that the Company has ever stated there was any contractual basis for the Buyer Consortium to renegotiate the deal, that the Company had a legal obligation to entertain any renegotiations, or that the Company could not have enforced the terms of the Original Merger Agreement against the Buyer Consortium.

### III. The Cayman Islands Appraisal Process and the Current Status of the Appraisal Proceeding.

25. Pursuant to Section 238 of the Act, where there has been a merger involving a Cayman Islands company, a shareholder who dissents from the merger in accordance with the procedure set out in Section 238 of the Act has a statutory right to payment of the "fair value" of their former shareholdings in the subject company, which is to be determined by the Grand Court.

26. The Company and the dissenting shareholders represented by my firm each filed a petition before the Grand Court on July 15, 2022, to commence the Appraisal Proceeding (**Exhibit 4** and **Exhibit 5**.) The parties have agreed that these proceedings will be consolidated and heard together. The dissenting shareholders and the Company sought to agree "directions," or the procedural steps in the Appraisal Proceeding to trial and the timing of those steps, prior to a directions hearing which took place on November 21 and 22, 2022 (the **"Directions Hearing"**). Although certain issues were agreed prior to the Directions Hearing, the Grand Court ruled on several outstanding issues in its judgment which was delivered on December 2, 2022. (**Exhibit 9**).

27. At that hearing, the Grand Court was informed that the dissenting shareholders may bring foreign discovery applications, including under Section 1782. As is clear from this judgment, the Grand Court did not place any restriction on the dissenting shareholders' ability to bring foreign discovery applications (including Section 1782 applications) from any target (including Respondents). Instead, its primary observation was to "encourage applicants to make such applications at an early stage and to progress them expeditiously." (**Exhibit 9** at ¶ 12). The

dissenting shareholders have agreed not to bring any foreign discovery applications (including Section 1782 applications) after a date specified in the directions order (i.e., 42 days after the Company has complied with its disclosure obligations).

28. At the trial of the petition in the Appraisal Proceeding, the Grand Court is required to determine the fair value of the dissenting shareholders' former shareholdings in the Company together with a fair rate of interest, if any, to be paid by the Company upon the amount determined to be fair value. This will involve, *inter alia*, consideration of valuation reports and testimony from valuation experts retained by the Company and the dissenting shareholders. One of the dissenting shareholders' primary assertions in the Appraisal Proceeding will be that the Revised Merger Price significantly undervalued their shares in the Company.

**IV.     Respondents and the Discovery Sought.**

29. Duff & Phelps and DPS are not parties to the Appraisal Proceeding. Moreover, both are incorporated in Delaware. (*See* Declaration of Duane Loft, Exhibits 3 and 4.) Therefore, they are not subject to the jurisdiction of the Grand Court, and the Grand Court cannot compel discovery from them.

30. The Petitioners seek discovery for use in the Appraisal Proceeding concerning the valuation of the Company and the rationale for the Amended Merger. Specifically, the Petitioners seek documents and testimony from the Respondents, the financial advisors to the Special Committee, concerning the value of the Petitioners' shares in the Company and the process that led the Special Committee and the Board to approve the Amended Merger, as well as to accept the Revised Merger Price.

31. I believe that the information sought in this Application is relevant to the question of the fair value of the dissenting shareholders' former shareholding in the Company and is likely

to assist the experts retained by the dissenting shareholders (including the Petitioners) and the Company, as well as the Grand Court itself, to determine the fair value of the dissenting shareholders' former shares in the Company.

## V.  Correspondence in the Appraisal Proceeding Relating to Duff & Phelps.

32. On August 12, 2022, the Company wrote to the dissenting shareholders stating that it would produce (i) "as part of its disclosure all (non-privileged) documents in Kroll's/Duff & Phelps' possession, custody or control in relation to Kroll's work for the Special Committee (i.e., including both Kroll's 'client' and 'internal' matter files)," as well as (ii) "affidavit evidence from a Kroll witness." **(Exhibit 10.)**

33. However, in my view, this offer is inadequate. As stated above, both Respondents are incorporated in Delaware and thus are outside the jurisdiction of the Grand Court. Therefore, the Grand Court has no power to compel discovery from them. In addition, I understand from Gunawan 1 that the Company only intends to produce documents from Kroll, LLC (i.e., "Duff & Phelps"), but not Kroll Securities, LLC (i.e., "DPS") **(Exhibit 11** ¶ 6.4.2). Moreover, according to Gunawan 1, the Company only has received 0.3gb of data from Duff & Phelps. (*Id.* ¶ 8.) In my experience, this appears to be a far smaller amount of data than one would expect for a financial advisor who acted on a multi-billion dollar transaction from September 2020 – March 2022.

34. As a comparison, in *In the Matter of 58.com* FSD 275 of 2020 (MRHJ), the dissenting shareholders filed a Section 1782 application against Houlihan Lokey, the financial advisor. There, Houlihan Lokey produced 11gb of data in the Section 1782 proceeding. And despite Houlihan Lokey arguing that any Section 1782 disclosure would be "duplicative" of what the company there would produce, Houlihan Lokey produced hundreds of documents that the subject company itself had not produced as part of its disclosure in the appraisal proceedings. Indeed, this

was recently acknowledged in an affidavit filed on behalf of the Company for the directions hearing on November 21 and 22, 2022, which accepted that the Houlihan Lokey Section 1782 application resulted in the production of "documents that had not been disclosed in the Cayman Islands." **(Exhibit 12 ¶ 11.)**

35. On December 9, 2022, prior to issuing the Application, certain dissenting shareholders sent a letter to the Company noting that they had "not presented any compelling reason why the Dissenters cannot pursue Section 1782 discovery against the relevant Kroll entities." This letter further noted that the Company had failed to provide any "factual or legal basis as to how the Company could have possession, custody, or power over [non-privileged documents in Kroll's/Duff & Phelps' possession, custody or control], including Kroll's internal documents/communications and documents/communications exchanged with third parties," and that the Company's proposal ignored documents from Kroll Securities, LLC, which also are properly discoverable. **(Exhibit 13.)**

Executed on December 13, 2022 at George Town, Grand Cayman, Cayman Islands.

ROCCO CECERE