# EXHIBIT 11

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 155 OF 2022 (DDJ)**

**IN THE MATTER OF THE COMPANIES ACT (2022 REVISION)**

**AND IN THE MATTER OF 51JOB, INC.**

_____

**FIRST AFFIDAVIT OF ERICK GUNAWAN**

_____

I, **ERICK GUNAWAN**, of 8 Marina View, Asia Square Tower 1, #43-01, Singapore, 018960, **MAKE OATH AND SAY** as follows:

**A      INTRODUCTION**

1. I am the Director of the APAC Technology and Analytics practice in Berkeley Research Group (Hong Kong) Limited ("**BRG**"). The practice provides digital forensic and eDiscovery consulting services in the Asia Pacific region, primarily servicing corporations and law firms. I have over 18 years of experience in providing forensic consulting, data identification and collection, compliance investigations and eDiscovery review services utilising advanced analytics and machine learning technologies. I hold a Bachelor of Computer Science degree and I have worked for various professional services firms and in-house with several leading law firms in Australia, the United States, the United Kingdom, and Singapore. I have worked on dozens of eDiscovery engagements where both digital and hardcopy evidence were required to be made available for review and disclosed.

2. BRG was engaged by 51job, Inc. (the "**Company**") on 17 August 2022 to collect, process and host electronically stored information relating to these proceedings, and to provide ongoing

project management and technical support throughout the duration of these proceedings.[1] As the team lead, I had day-to-day conduct and oversight of the document collection and other tasks carried out in respect of this matter.

3. The facts and matters set out in this affidavit that are within my own personal knowledge are true and correct. Where the contents of this affidavit are not within my own personal knowledge, I have stated the source of my knowledge, and such facts are true and correct to the best of my information and belief. I have been requested by the Company to make this affidavit in support of its Summons for Directions.

4. There is now produced and shown to me a paginated exhibit marked "**EG-1**" containing the documents referred to in this affidavit. Where I refer in this affidavit to a page or page number, that is a reference to that page of exhibit EG-1.

**B**    **SUMMARY OF THE COMPANY'S DISCOVERY EXERCISE**

5. I have reviewed the terms of the draft Directions Order (the "**Draft Directions**") being proposed by the Company in relation to Company disclosure, a copy of which is at **pages 15-62**. I understand from the Company's Cayman Islands legal counsel, Maples and Calder ("**Counsel**"), that the Company proposes to make, and BRG have been instructed to facilitate from a technical perspective, discovery of:

    5.1. The documents identified at paragraph 9 of the Draft Directions (**page 17**) that comprise all of the documents that were made available by the Company to members of the buyer group via the transaction due diligence data room (the "**TDD Documents**") set up in relation to the merger transaction (the "**Merger**");

---

[1] A copy of our letter of engagement with the Company is at pages 1-14.

5.2. The documents falling within the categories listed at Appendix 3 of the Draft Directions (**pages 42-46**), and all additional documents, which exist and are within the Company's possession, custody or power and which were created or received between 26 April 2017 and 26 April 2022 (Cayman Islands time) (the "**Valuation Date**"), i.e. within the five year period ending with the date of the extraordinary general meeting at which the Merger was approved (the "**Relevant Period**") (except where a different date range is expressly provided in any of the categories listed at Appendix 3), which are relevant to the question of the fair value of the Dissenters' shares in the Company;

5.3. All other non-privileged documents in the Company's possession, custody or power which are relevant to the determination of the fair value of the Dissenters' shares in the Company as at the Valuation Date, and which were prepared or created within the Relevant Date Range, as provided for at paragraph 11 of the Draft Directions (**page 17**); and

5.4. Any additional information, documents and communications requested by any Expert (as defined in the Draft Order) for the purpose of preparing his/her Expert reports, which may include documents, communications, materials or information produced after the Valuation Date

(together, the "**Relevant Documents**").

**C    CURRENT PROGRESS**

*Identification of custodians and sources of documents*

6. I am informed by Counsel that with a view to identifying Relevant Documents, Counsel:

    6.1. Held discussions with the Company to identify the key personnel and third-party service providers and advisors involved in the Merger or otherwise likely to possess (or have possessed) Relevant Documents ("**Custodians**");

    6.2. With the assistance of the Company, issued document preservation notices to those Custodians, informing them of the categories of documents the Company will likely be directed to disclose in these proceedings, foreshadowing collection of those documents by the Company's e-discovery services provider, and directing the Custodians to preserve all forms of documents and communications;

    6.3. With the assistance of BRG, prepared written questionnaires for the Custodians containing technical questions about the devices on which they used or previously used to create, send and store Relevant Documents;

    6.4. Issued documentary requests and/or liaised with the following special committee members and third-party service providers and advisors on the search for potentially Relevant Documents and the collection of their documents:

        6.4.1. Special Committee members, Dr. Li-Lan Cheng and Mr. Eric He;

        6.4.2. Duff & Phelps d/b/a Kroll LLC ("**Kroll**"), independent financial advisor to the Special Committee, through their legal counsel, Winston & Strawn ("**W&S**");

        6.4.3. Davis Polk & Wardwell LLP ("**DPW**"), independent legal counsel to the Special Committee;

6.4.4. Simpson Thatcher & Bartlett LLP ("**STB**"), US legal counsel to the Company; and

6.4.5. Rocketeer Management, strategic consultant to the Company.

*Collection of documents*

7. In respect of the collection of documents from the Custodians, BRG has, as at the date of this affidavit:

    7.1. Collected all of the TDD Documents provided by the Company;

    7.2. Downloaded documents from the Company's file server;

    7.3. Collected all emails for the Relevant Period from a mailbox (ir@51job.com) utilised by the Company's investor relations department;

    7.4. Conducted two rounds of document collection from 13 Company Custodians who have been identified at this stage as holding Relevant Documents. All accessible emails of these Custodians at the time of collection were collected for the Relevant Period. As to the laptops and/or desktops of the Company Custodians, all accessible files at the time of collections were either collected in their entirety with certain folders excluded from collection (on the basis that they contained personal information) (the "**Exclusion Method**"), or selected folders from these devices, as identified by the relevant Company Custodian, were made available to BRG for collection (the "**Inclusion Method**");

    7.5. Received Kroll's documents from W&S; and

    7.6. Received emails and documents from Maples and Calder (Hong Kong) LLP ("**Maples HK**"), the Company's Cayman Islands corporate legal advisors in respect of the Merger.

***Processing of documents collected***

8. The process of identifying and collecting potentially Relevant Documents is ongoing and to date has resulted in a collection of approximately 3,922.3 GB of data in total (the "**Entire Data Set**"), of which 4.7 GB are attributable to the TDD Documents, 38.8 GB are attributable to the data downloaded from the Company's file server, 3,877.6 GB consist of data collected from the Company Custodians, 0.3 GB consist of data received from Kroll, and the remaining 0.9 GB pertain to documents received from Maples HK.

9. BRG processed, and is continuing to process on rolling basis, the Entire Data Set as follows:

    9.1. Industry standard electronic discovery tools, including Encase Forensic and Relativity, were used to process the Entire Data Set.

    9.1.1. Encase Forensic is recognized globally as the standard for digital forensics and is a court-proven solution built for finding, decrypting, collecting, preserving and triaging forensic data from a wide variety of devices. It is built with a deep understanding of the digital investigation lifecycle and the importance of maintaining evidence integrity. All evidence captured with Encase Forensic is stored in the Encase evidence file formats, which are generally accepted by courts around the world, including High Court of Justice in England, Supreme Court of New South Wales, Supreme Court of Singapore and High Court of Singapore, to name a few.

    9.1.2. Relativity is one of the leading document review platforms utilised by organisations and law firms globally, and is designed to help legal teams and other users manage complex data sets in litigation, regulatory investigations, and compliance matters. It has the ability to process large volumes of data from various sources and convert them into a review-ready format thereby allowing the review process to be conducted more efficiently. Furthermore, Relativity is equipped with

various advanced data analytical capabilities which includes technology assisted review and active learning, further enhancing the efficiency of review.

9.2. Prior to processing, a "triage" process was performed using Encase in relation to the data collected from the Company Custodians using the "exclusion" method. The purpose of this triage process was to exclude system files, unused hard drive space and other files which contain no user-generated or human-authored information or data. This triage process resulted in the exclusion of 3,074.7 GB of data which was determined to contain no user-generated or human-authored content. This process also resulted in the deferral of 161.2 GB of data from processing pending a preliminary review of the folder and file lists of the deferred documents by Lang Yue and Maples, as this data set was large and appeared likely to contain personal or irrelevant information on its face. Upon completion of the triage process there remained 686.4 GB of data for immediate processing.

9.3. The remaining 686.4 GB of data is being indexed (or "processed"), on a rolling basis, using Relativity. During this process, the following additional steps are applied to the data:

9.3.1. Extraction of text and metadata from all documents;

9.3.2. De-duplication of all documents based on their MD5 hash values;

9.3.3. Removal of files which match a list of file signatures pertaining to known irrelevant files (a process known as deNISTing, as specified in Appendix 5 of the Draft Directions (**pages 48-54**);

9.3.4. Performing Optical Character Recognition (OCR) over any non-searchable PDF or image files to render the documents' text searchable; and

9.3.5. Application of a single time zone of UTC+8 (China Standard Time/ Hong Kong Time).

9.4. Once documents are indexed, they are subject to an exception handling and quality control ("**QC**") process, during which (i) any potential errors in processing are identified and rectified to the extent possible, (ii) text extraction and OCR results are sampled for quality verification and (iii) any password-protected items are identified.

9.5. Following QC checks, the documents are then filtered by the Relevant Period (that is, 26 April 2017 to 26 April 2022 Cayman Islands time). This is the earliest stage in the process at which a reliable date filtering method is available to us.

10. This has resulted in an initial data set of approximately 1,065,497 documents as at the date of this affidavit (the "**Initial Data Set**"), of which 730,587 are primarily in Simplified or Traditional Chinese, and a further 33,561 are at least 20 per cent in Simplified or Traditional Chinese. Processing the Entire Data Set and undertaking necessary QC checks and exception handling have taken approximately 39 days for the c.686.4 GB of data processed to date. Data will continue to be collected on a rolling basis and will be processed as it is received.

*Further identification and collection of documents*

11. I understand Counsel is continuing to identify whether there are any additional custodians or data sources where Relevant Documents may be found, and whether further collections of documents from the Custodians identified at this stage are necessary. As to the latter, BRG was instructed to generate, at the point of collection, the complete folder and file lists of the laptops/desktops of all Company Custodians whose documents were collected using the Inclusion Method, in order for Counsel to ascertain from those lists whether supplemental collections of documents from those Company Custodians would be necessary. The folder and file lists were first provided to the Company's PRC counsel engaged in respect of this matter, Shanghai Lang Yue (Beijing) Law Firm ("**Lang Yue**"), for their initial review to ensure that the circulation of these lists outside of the PRC would not give rise to any issues under PRC Data Protection Laws (as defined below). The folder and file lists were then provided to Counsel for their review.

12. Counsel have since completed the review of the folder and file lists, and have ascertained that supplemental collections would be required in respect of certain of the Company Custodians whose documents were collected on an Inclusion Method. BRG has therefore been instructed to conduct a further round of document collection from the Company this month (October 2022).

## D     REVIEW OF THE INITIAL DATA SET

13. The Company and its business are located in the PRC. I understand from the Company's PRC lawyers at Lang Yue that the PRC Cybersecurity Law, Personal Information Protection Law and Law on Guarding State Secrets (amongst others) (together, the **"PRC Data Protection Laws"**) apply to the Company and its documents.

14. BRG was informed by Counsel that the Initial Data Set comprise data subject to PRC Data Protection Laws ("**PRC Data**") and data collected from Custodians outside of the PRC ("**Non-PRC Data**"), which, as at the date of this affidavit, consist of documents collected from Kroll and Maples HK. BRG was instructed to upload the PRC Data to its PRC server and the Non-PRC Data to its Hong Kong server upon collection, which we did.

15. BRG was also instructed by Counsel to facilitate a two-stage rolling review process of PRC Data, as follows:

    15.1. A first-level review of the PRC Data would be conducted by Lang Yue within the PRC for relevance, and to identify data falling within the scope of PRC Data Protection Laws ("**Protected Data**") (the "**First Level Review**"). BRG would provide technical support to Lang Yue for the First Level Review, including enabling suitable software to allow the redaction of Protected Data, and Counsel would provide Lang Yue with general search terms and search matrixes to narrow the scope of the First Level Review and/or to identify potentially Relevant Documents; and

15.2. In respect of PRC Data cleared by Lang Yue or Protected Data that have been redacted by Lang Yue, BRG would move that data from its PRC server to its Hong Kong server and provide technical support for a second-level review by Counsel (the "**Second Level Review**") and associated QC checks.

16. As to the Non-PRC Data, BRG was informed by Counsel that those documents would not be reviewed by Lang Yue for PRC Data Protection Law issues, and would be reviewed by Counsel directly. I note from the breakdown provided at paragraph 8 above that the size of the Non-PRC Data is significantly smaller than that of the PRC Data, meaning that a far larger number of documents would still be subject to the two-stage review process discussed above.

17. The reviews may be assisted by the use of our Relativity analytics and assisted review software, which allow reviewers to categorise documents and automate the review process to improve efficiencies. Some Relativity analytics capabilities include: email threading which can help reducing the time and complexity of reviewing emails by gathering all forwards, replies and reply-all messages together; textual near duplication identification which can identify documents that are similar in content; and language identification which examines extracted text of each document to determine the primary language and up to two secondary languages present. Relativity assisted review capability features active learning which is a technology that helps reviewers to quickly organise data and predict which documents are most likely to be relevant to reviewers. Both Relativity analytics and active learning technology are language independent and able to perform their intended functions irrespective of languages the documents may contain.

18. I will provide an update on the status of the documents processed and reviewed in my reply evidence due on 9 November 2022.

## E      COMPLICATING FACTORS

*Impact of the Covid-19 Policy in Mainland China*

19. BRG have been able to progress the collection of documents from the Company notwithstanding the Covid-19 restrictions in place in the PRC, although it had to cross a number of logistical hurdles in order to do so, as discussed further below at paragraph 23. Moreover, given that the PRC government continues to maintain a 'dynamic zero-Covid' policy aimed at eliminating Covid-19 from mainland China (meaning the PRC other than the Hong Kong and Macau Special Administration Regions), there remain considerable restrictions in place in both Beijing and Shanghai, which has affected the rate at which the Company is able to progress the discovery exercise.

20. In particular, international travel to and domestic travel within the PRC has been and remains subject to restrictions. I understand this has prevented and continues to prevent Counsel, who are based in the Cayman Islands and, more relevantly for assistance with discovery, in Hong Kong, from attending onsite to oversee and facilitate the identification of relevant Company data, including data in WeChat or other instant messaging applications that may have been utilised by the Company Custodians.

21. Further, the remainder of the document collection exercise involving PRC Data could potentially be affected given that the measures and restrictions relating to Covid-19 in mainland China continue to change regularly and often with short notice, and the PRC government has provided no indication as to when the 'dynamic zero-Covid' policies would end. Currently, these policies still involve tracing all close contacts of reported Covid-19 cases and sending all positive cases and close contacts to government isolation facilities or hospitals, and locking down the building in which the positive case or close contact was detected. It also entails the implementation of severe lockdowns (which are still being imposed in some districts as at the date of this affidavit) and work-from-home orders in specific areas from time to time, often for substantial periods of time.

22. There have also been and continue to be restrictions intermittently imposed within provinces and cities, as a result of which individuals residing or working in a particular district or suburb may be unable to travel to other areas within their city. In addition, there have been and continue to be restrictions imposed intermittently on individuals, such that individuals who are deemed to be at a higher risk of being infected with Covid-19 or who have not returned a negative Covid-19 test result within a certain time period, have their mobility limited, based on a 'health code' mobile phone application that uses colour-coding to reflect each person's deemed level of risk and their ability to access premises is restricted accordingly.

23. In order for BRG to carry out the two rounds of document collections at the Company's offices in Shanghai, we had to deploy additional resources from outside of Shanghai given the unavailability of our local resources in Shanghai due to Covid-19 related reasons. BRG employees travelling into Shanghai had to obtain a green health code and a negative nucleic acid testing result within 48 hours prior to entering Shanghai. Furthermore, they had to conduct another test in Shanghai within 72 hours prior to visiting the Company's premises. Upon returning to the originating city, they had to place themselves into a 3-day self-isolation, conduct two nucleic acid tests and present both negative results in order to receive a green health code to be released from home quarantine. Fortunately, all of our employees tested Covid-19 negative throughout the collection process, and they were able to perform the necessary work with minimal interruption.

24. However, given the ongoing restrictions discussed above, there is no guarantee that future collection work in the PRC would not be met with interruption if BRG's employees were unable to clear the nucleic acid test or obtain a green health code. I do not expect that the PRC government will move away from sudden lockdowns and the 'dynamic zero COVID' policy more generally this year and I expect the restrictions and measures referred to above will likely continue into the foreseeable future. All of these matters continue to affect BRG's ability to plan for and conduct future collections of PRC Data.

***Collection and processing of documents from Custodians***

25. Our team met with several complications during the collection phase due to the following matters:

    25.1. The variety of computer models that the Custodians used meant that additional time was needed in order for us to determine the appropriate collection approach and forensic tools to be deployed.

    25.2. The storage of the Company's email data partly on the Company's server and partly on the Custodians' computers required us to collect from both sources in order to make sure that all accessible email data relating to the Company's Custodians at the time of collection has been fully collected.

    25.3. The presence of email encryptions on some of the Custodians' email data necessitated discussions with those Custodians and/or the Company IT team to determine the appropriate method to decrypt the data to allow for collection. Several of those discussions occurred after working hours, and efforts needed to be made to locate and contact the relevant Custodians which resulted in additional time taken to complete the collection process.

    25.4. The technical issues W&S encountered in its file transmission system while transmitting Kroll's documents to us resulted in a delay in receiving Kroll's documents and uploading them onto our Hong Kong server.

26. Furthermore, during the processing phase we encountered the following issues requiring further time and attention, the resolution of which is ongoing:

    26.1. Several password-protected documents were identified within the dataset processed to date (i.e, the Initial Data Set). This has necessitated a two-stage remediation process – in the first stage, Company Custodians were asked the details of any passwords they may be aware of having used, and BRG technicians attempted to extract potential

passwords from a sample of emails likely to contain them. Processing of password-protected items was then re-attempted, resulting in the successful decryption of some documents. The second stage, which is currently ongoing, involves Counsel and Lang Yue reviewing the list of remaining password-protected documents to identify items which appear to be potentially relevant and not personal in nature. Once identified, BRG will make further decryption attempts using specialised software, which can take hours or days depending on the nature of the documents.

26.2. 329 PDF documents containing XFA forms were identified during processing. This form of PDF is not supported by the versions of Relativity available in the PRC, and requires manual extraction of searchable text externally to Relativity. This process is ongoing.

26.3. A currently indeterminate number of documents with Chinese file names or file paths were extracted from ZIP files which were not encoded with Chinese character sets. This is a common issue with ZIP files in relation to Chinese characters, which in effect renders the file names and paths of the contents (but not the contents themselves) indecipherable. It is often possible to restore the original file names, although this requires the creation and testing of customised scripts. Further work is in progress to identify the extent of this issue, and to attempt remediation and restoration of the original file names.

## F    ANTICIPATED TIMING

27. As at the date of this affidavit the following workflows continue or are anticipated:

    27.1. Further collections from Company Custodians whose documents were initially collected on an Inclusion Method (and any further Custodians Counsel identify as part of the ongoing discovery process);

27.2. Further collections from non-Company Custodians. In particular I understand that STB and DPW, as part of their internal procedures, are conducting internal reviews and checks of documents they have identified as being potentially Relevant Documents, and that the collection of their documents is likely to be scheduled in the following month;

27.3. Collection of potentially Relevant Documents from any instant messaging applications utilised by the Custodians;

27.4. Processing of data to be collected per paragraphs 27.1 to 27.3 above;

27.5. Ongoing assistance to Counsel with interviews or calls with Custodians to facilitate the collection of potentially Relevant Documents identified, and keyword and email searches of the Initial Data Set as directed by Counsel; and

27.6. Batching any potentially Relevant Documents identified from the Initial Data Set for First Level Review by Lang Yue and Second Level Review by Counsel, along with facilitating QC checks at each level.

28. Given that the process of collecting data from Custodians is still ongoing, the size of the Entire Data Set is not yet known. Consequently, the processing of the Entire Data Set to produce the Initial Data Set, and the process of identifying from the Initial Data Set the potentially Relevant Documents to be batched for review, is necessarily ongoing. For that reason, it is challenging to predict with accuracy at this stage a timeline for completion of the process of identifying and giving discovery of the Relevant Documents.

29. That said, I am advised by Counsel that Lang Yue has the capacity to conduct the First Level Review at a rate of approximately 12,000 documents per week based on certain assumptions, and that Counsel expect to be able to conduct the Second Level Review of relevant documents arising from Lang Yue's First Level Review at a rate of approximately 15,000 documents per week.

30. Based on the information provided by Lang Yue and Counsel, the First and Second Level Review of the potentially Relevant Documents (which is a subset of the current Initial Data Set (comprising 1,065,497 documents)) will take at least 26 weeks. An additional 2 to 3 weeks would need to be factored in for (i) the transfer of documents from BRG's PRC server to the HK server, and (ii) the completion of the First and Second Level Review QC checks based on the current number of documents in the Initial Data Set.

31. For the avoidance of doubt, my time estimate above does not take into account further the number of documents which are very likely to be produced as part of the ongoing collection exercise. They also do not take into account any higher level reviews which may be carried out. Both of those factors can reasonably be expected to prolong my time estimate above.

32. I will provide an updated time estimate in my reply evidence due on 9 November 2022.


| | |
|---|---|
| SWORN at | ) |
| | ) |
| | ) |
| | |
| On this 12 day of October 2022 | ) |
| | )     **Erick Gunawan** |
| before me | ) |

_____

Notary Public